MONCURE, P.
delivered the opinion of the court.
The main, if not the only substantial question involved in this case is, as to the •liability of persons on the ground of having participated in a devastavit committed by an executor, in selling a portion of the assets *of his testator and converting the proceeds of sale to his own use.
There can be no doubt but that an executor is invested with the legal title to the assets of his testator which come to his hands for administration, whether they arise from personal estate, or from real estáte directed by the will to be sold for the payment of debts and legacies, and sold accordingly by the executor.
Nor can there be any doubt but that a bona fide purchaser, for value and without notice, of a portion of such assets, either directly or indirectly from the executor, will acquire a good title thereto, even though the executor commit a devastavit by making the sale for the purpose of converting the proceeds to his own use, and by actually so converting them.
Nor can there be any doubt but that if the purchaser be privy to the intended dev-astavit of the executor at the time of the purchase, or fraudulently contribute to such devastavit in any way, such purchaser will be liable for the loss sustained by creditors, legatees or others by reason of such devas-tavit.
Nor can there be anjr doubt but that the executor in this case, Edmund Fitzgerald, Jr., committed a devastavit by selling and .converting to his own use, bonds taken for the purchase money of land of his testator, William Fitzgerald, Jr., directed by the will to be sold for the payment of debts and legacies.
The only question remaining to be considered in this case therefore is, whether the purchasers of said bonds, claiming, directly or indirectly, from or under the said executor, were, at the time of their purchases respectively, privy to his intent to commit such a devastavit, or otherwise contributed to the commission of the same. *And this question arises as to three different parties whose cases involve different facts, and somewhat different principles, and must, therefore, 'be considered separately. These three parties are G. D. Neal, Richard Jones and Elisha Barks-dale, Jr. The court below decided the question against the first and second of these three parties, and in favor of the third, and pronounced a decree accordingly. This appeal was taken from that decree. Is it erroneous; and if so, in what respect?.
We will consider the case of each party in the order in which he is above named; but before we do so, we will notice some matters of fact and law which apply alike to all the cases, and seem to be material to be stated; and
First, as to matters of fact: The testator died in September 1857, leaving, besides his slaves, which he directed not to be sold, an estate which exceeded in value the amount of his debts by about eight or ten thousand dollars, and leaving as the only objects of his bounty his wife and posthumous child, with the exception of a legacy of $20 to the Rev. C. C. Chaplin, and a contingent devise to his brother and executor Edmund Fitzgerald.
The executor, at the time of his qualification as such, in October 1857, was a man of large property and undoubted solvency, and it seems continued so to be until he removed from the state, in 1862. His executorial-bond was in the penalty of $34,000, and his original sureties were Sexton W. Smith and Samuel Bradley. On the 19th of November 1857, he sold the whole estate, real and personal, which was subject to sale under the will, and returned an account of sales, which was duly recorded. The whole amount of .the sale was $10,565.40, including two tracts of land, one of * which was sold to Raleigh White for $3,982.50, and the other to Archer B. Womack for $4,293. The land was sold on a credit of one, two and three years, and the purchasers executed their bonds for the purchase money, payable to the executor as such. The assignments made of some of these bonds to the three parties before named, respectively, were all made in the spring and summer of 1859; and each bond had, at the time of its assignment, some time to run to reach its maturity; and the purchaser or assignee in each case paid less than would have been due upon the bond after abating the legal discount. Sometime in the last named'year, 1859, the testator’s widow, Martha W., intermarried with Cad-dis B. Buck. In March 1859, Commissioner Clark reported a settlement of the execu- *519 torial account of said executor, showing' a balance due him on the 21st of that month of $765.41; and in 1860, the same commissioner reported another settlement showing a balance due the executor of $1,122.94. But these accounts did not embrace any credits to the estate on account of sales of realty, on which account it appears that the executor had received money which if brought into the said settlements would have made him a debtor instead of a creditor to the estate.
In September 1860, Buck and wife brought their suit in the Circuit court of Pittsylvania county, to obtain a settlement of the exec-utorial account, and to recover their portion •of the said testator’s estate; making the said executor and Martha W. Fitzgerald, her child by the said testator, defendants to the suit, but not making the sureties of the said executor parties. In May 1861, the said executor having, it seems, been ruled to give a new executorial bond, with sureties, accordingly gave one in the same penalty of $34,000, with John W. «Holland and Wm. T. Clark as his sureties. In November 1862, the said Buck made oath before a justice of the peace of said county, that he believed that the said executor was indebted to him and his wife and the said Martha W. Fitzgerald, in at least the sum of $10,000, which they would recover in the said suit, and that he had probable cause for believing and did believe that said executor, Edmund Bitz-gerald, was about to quit the state unless he was forthwith apprehended, and therefore the said justice ordered the said executor to be held to bail in the said suit in equity, in the sum of $10,000. The said Buck, with said Holland and Clark as his sureties, entered into a bond before the said justice in the penalty of $10,000, reciting that the said Buck was about to sue out a writ of capias ad respondendum against the said Edmund Fitzgerald in the said suit in equity, and conditioned for the payment of all costs and damages which might be awarded against said Buck, or sustained by said Eitzgerald by reason of the arrest of the latter under said writ. And the same having been accordingly issued, was executed on the said Edmund; who thereupon gave as his bail, in the sum of $10,000, A. E- H. Muse. The said bail, it seems, was insolvent when taken, and has ever since remained so, but no proceeding has ever been had to subject him to liability on his recognizance, nor to subject the sheriff or his securities to liability for taking insufficient bail. Soon after giving said bail it appears that the said Edmund left the stale, and he has never since resided therein. About that time he ceased to be executor of William Eitzgerald, whose estate was thereupon committed to Coalman D. Bennett, sheriff of said county, for administration de bonis non with the will annexed, who «never received any assets and has since died, and the estate has since been unrepresented, there being in fact, no uuadministered estate.
In June 1868, the said Buck and wife amended their bill, making the said sureties, Holland and Clark, defendants thereto, in addition to the original defendants. In October thereafter, the said sureties filed their answer; in which, among other things, they say that “at the time of thoir joining in said bond, said executor was deemed by them, and was generally considered, able to pay his debts and liabilities, and he satisfied these respondents that he owed nothing or very little to the estate of his testator. Indeed, his accounts as personal representative, settled by the proper officer, showed this. ’ ’
In February 1869, the said sureties, Clark and Holland, brought their suit and filed their bill in the same court, to which they made the said Buck and wife, Martha W. Eitzgerald, C. D. Bennett, late sheriff, and as such administrator as aforesaid, Edmund Eitzgerald, late executor as aforesaid, G. D. Neal, Richard Jones and Elisha Barksdale, Jr., and John Cannady, administrator with the will annexed of said Raleigh White, defendants. The complainants set out in their bill an account of the proceedings which had been had in the aforesaid suit of Buck & wife v. Eitzgerald &c., and exhibit a copy thereof. They “charge that the proceeds of the sales of said lands were, in fact, never collected by said executor; but the bonds executed by the purchasers of said land were sold at a very heavy discount to the persons hereinafter mentioned, at a time when there was no necessity for so doing, the estate being abundantly able to pay all the debts of the testator without any sacrifice of the assets, the executor not being then in advance to any «considerable amount to said estate ; and if he had been, said estate being able to pay him said amount without sacrifice of the assets, and said executor holding no debt against the estate; all which facts were well known to the purchasers of the assets hereinafter mentioned, and to 'each of them.” The complainants then set out in detail what are charged to be the facts in regard to each purchase; after which they say they “are advised that by reason of the premises the said executor has committed a devastavit in the disposal of said bonds, and that said Neal, Jones, Barksdale and White have participated therein, and are each, and the estate of said White, responsible to your orators for the amount of the bonds purchased by each as aforesaid, in consequence of the participation which each of them has had in the devastavit aforesaid, they having applied to said Bennett to recover the same, who refuses to do so, having no assets to pay costs, and is willing that your orators should sue therefor. They are advised that they may be substituted to the rights of the devisees and legatees under the will of the testator, to charge the parties aforesaid for the assets so as aforesaid unlawfully appropriated to their own use, and that because your orators fear they may be subjected to a charge of said devisees and legatees, they may call *520 the parties aforesaid to account for said assets, as a necessary step in the settlement of the administration of said executor, and to aid them in the defense of the suit aforesaid of Ruck and wife, &c. ; “to which bill they file this as a cross-bill, and pray that both cases may be heard together, and that any decree which may be rendered against your orators, as sureties as aforesaid, in favor of said Ruck and wife and said Martha W. Fitzgerald, may be rendered, first to be satisfied by said Neal, Jones, *Barksdale, ” &c., “to the extent of any amount of testator’s assets which they or either of them may have illegally acquired as aforesaid.”
The complainants then, after making the persons before named defendants to their bill, propound special interrogatories to said Neal, Jones, Barksdale, &c., and pray for special and general relief, suitable to the case made out in their bill. The two suits separately progressed to final decrees; answers and depositions having been filed, accounts settled, and orders made from time to time, which it is unnecessary now further to refer to. The final decree, in Ritck & wife v. Fitzgerald, was entered on the 7th of November 1870, by which the said Fitzgerald, and Clark and Holland, his sureties as aforesaid, are decreed to pay the balances ascertained to be due from said Fitzgerald, ex’or as aforesaid, to said Ruck and wife and Martha W. Fitzgerald respectively, the balance due to the former being $2,172.56, and that to the latter $6,022.68, with interest on each from the 20th day of October 1862, and also to pay to the plaintiffs their costs expended in the prosecution of the suit. The final decree in Clark & Holland v. Ruck, &c., was entered on the 7th day of June 1871, by which the plaintiffs’ bills were dismissed with costs as to the defendants, Barksdale and Cannady; “and the court being of opinion that the bonds of $1,000, executed by A. B. Womack and J. M. Adams to Edmund Fitzgerald, executor of William Fitzgerald, deceased, on December 1st, 1857, payable on or before the 18th day of November 1859, with interest from 18th November 1858, assigned by the said executor to the said G. D. Neal on. the 15th day of June 1859, and by him to the aforesaid Richard Jones on the 2d day of July 1859, and of $2,293, executed by the said Womack and Adams to the said executor *on the 1st day of December 1857, payable on or before the 18th day of November 1860, with interest from November 18, 1858, and assigned to the defendant, Neal, on the 15th day of June, 1859, and by said Neal to the aforesaid Richard Jones, deceased, on the 21st day of June 1859, were each illegally transferred by the said Edmund Fitzgerald, executor as aforesaid, to the defendant, G. D. Neal, by which transfer a devastavit of said assets was committed by the said executor, in which the said Neal illegally participated; that said transfers by said Neal of the said bonds to the said Richard Jones in his lifetime were also illegal, in consequence of the knowledge of the said Jones at the time of the transfers to him of the illegal transfers thereof to the said Neal;” and the court being further of opinion that said Edmund Fitzgerald and G. D. Neal, and the defendants, Scruggs & Smith, executors of said Jones, out of the assets of their said testator, are liable to pay the amount of said bonds, including principal and interest, to those entitled thereto. The court accordingly decreed such payment to be made in exoneration of the plaintiffs, Clark and Holland, as sureties aforesaid, and on account and in part discharge of the decree rendered against them in Luck & wife v. Fitzgerald, &c., on the 7th of November 1870 as aforesaid. And it appearing to the court that the defendant, C. D. Bennett, late sheriff, and as such administrator de bonis non with the will annexed of William Fitzgerald' was dead, and that no further administration had been taken on the estate of said Fitzgerald; and it further appearing that all the debts due from the said estate had been provided for, and that all the debts due to the said estate had been collected except those mentioned in the said decrees; the court did not deem it proper to delay the cause for the appointment *of a personal representative of said Fitzgerald, and for making him a party to the suit. And the defendants, Fitzgerald and Neal, out of their own estates, and Smith and Scruggs out of the assets of their testator Jones, were decreed to pay the plaintiff’s costs of suit. From this decree the appeal in this case was taken.
In stating the material facts of the case which apply to all the parties sought to be made liable as participants in the devastavit of the executor, the following additional facts may be worthy of observation. The executor was the brother, and probably the only brother, of the testator, who reposed great confidence in him, by appointing him his executor, and investing him with ample powers as such, over his whole estate, real and personal. The executor, as we have seen, was “a man of large property and undoubted solvency,” and so continued to be until he removed from the state in 1862. Though the sale of the bonds was made by the executor in 1859, and it must have been generally known to the parties concerned that such sale had been made, and that the money had been received by the purchasers from the obligors in the bonds, yet no question appears ever to have been raised as to the liability of the purchasers, until about ten years after the purchases were made, seven years after the executor had removed from the state, and four years after the end of the war, which had reduced him to utter insolvency; and then, to wit: in 1869, they were sued, not by the creditors or legatees of the testator, nor by his administrator de bonis non with the will annexed, but by the sureties of the executor, who became such in 1861, after the suit of Ruck and wife had been brought against him, and after he had been ruled to give a new *521 bond with surety. Even then, it appears, the executor was still “a man of large property and undoubted solvency;” *and non constat, that if he had not given a new bond with sureties, he could not and would not have been compelled to account for and pay what he owed to the legatees of his testator. The sureties became such long after all the bonds for the purchase money of the land sold by the executor had become payable, and no doubt after all or nearly all of it had been actually paid. It does not appear that the legatees, or any other persons interested in the subject, have sustained any damage from the sale of the bonds; or. that if the executor had received the full amount of them from the obligors, or from the purchasers, which he certainly had a right to do, he would have accounted for the same to the legatees.
Having noticed such matters of fact as are applicable to all the • cases alike and seem to be material, we proceed now to make a statement in the same general way.
Secondly, as to matters of law; All the cases agree in the principle, that a purchaser from an executor, of personal property of the testator, for valuable consideration, need not inquire, and has no adequate means of inquiry, whether the condition of the testator’s estate requires a sale of the property, and is not bound to see to the application of the purchase money; but may fairly presume, that the sale is rightly made, and that the purchase money will be properly applied; and that such a purchaser can only be made liable on the ground of fraudulent participation with the executor in the commission of a devastavit of his testator’s estate. In other words, that the purchaser must be guilty of a fraud in that respect. The only diversity in the cases seem to have arisen from the different views of judges as to the nature of the fraud, within the meaning of the principle; that is, ^whether there must be actual fraud, or whether it is enough that there is implied or constructive fraud, or gross negligence on the part of the purchaser which may be equivalent to fraud. The older cases seem to have required that there should be actual fraud. Heading among them were the cases of Nugent v. Gifford, 1 Atk. R. 463; and Mead v. Lord Orrery, 3 Id. 235; decided by Lord Hardwicke; and Whale v. Booth (cited in 4 Term. Rep. 625, note), decided by Eord Mansfield. In the first named case, the executor assigned over a mortgage term of his testator to C, in satisfaction of a debt which the executor owed him; yet Eord Hardwicke held it a good alienation against the creditors and heirs. He said “the court would follow the assets in case of fraud, but not where the executor disposed of them for a valuable consideration, and without fraud; and that it would be very mischievous if the court were to control this power of alienation, as no person would venture to deal with executors.” ‘ ‘There was no difference between the power of the executor to dispose of legal and of equitable assets.” To the same effect are the other cases.
But subsequent cases have modified and restrained the extent of this doctrine in some respects: leading among them are the cases of Bonney v. Ridgard, 1 Cox R. 144, Scott v. Tyler, Dickens 712, and Hill v. Simpson, 7 Ves. 152. In the first of these cases Eord Kenyon, master of the rolls, admitted that in general the purchaser from the executor of the testator’s assets was not bound to see to the application of the money; but that if upon the face of the assignment of the property, it appeared to have been made in satisfaction of a private debt of the executor, the sale was fraudulent against the persons interested under the will, and equity would relieve. It would be a case of implied *fraud; and he accordingly condemned the decision of Eord Hardwicke before mentioned, and said he would have made an opposite decision in that case. In Scott v. Tyler, Lord Thurlow held that where an executor pledged bonds specifically devised, as a security for his own debt, the pawnee must deliver up the bonds for the benefit of the specific legatees. He admitted that in general the purchasers of the assets had no concern with the application of the price, and that the rule applied equally to mortgagees, bonds and leases. But if one concerted with the executor to obtain the effects at a nominal price, or at a fraudulent undervalue, or in extinguishing the private debt of the executor, or in any other manner contrary to the duty of the office of executor, the purchaser or pawnee will be liable. In this case bonds of the testator were delivered to the bankers as a security for the private debt of the executrix, and they were ordered to be delivered up and the bankers to account for the interest received; and though the bankers believed the representation of the executrix, without looking at the will, it was not sufficient to protect them. They knew that the bonds could not be so appropriated until all the debts and legacies were paid; and the chancellor must have proceeded on the ground of gross negligence or implied fraud in the bankers. In Hill v. Simpson, Sir William Grant made a similar decree, by setting aside the transfer of assets by an executor to secure his own debt under circumstances of gross negligence, though not of direct fraud in the creditor to whom they were transferred. These and other cases on the subject are fully reviewed by Chancellor Kent, in Field v. Shieffelin, 7 John. Ch. R. 150, a leading case, and one which goes very far in favor of a bona fide purchaser in such cases. That was a case of *a purchaser from a guardian. After getting through with his review, he thus concludes: “I have thus looked pretty fully into the decisions in the analogous case of a purchase from an executor of the testator’s assets; and they all agree in this, that the purchaser is safe if he is no party to any fraud in the executor, and has no knowledge or proof that the executor intended to misapply the proceeds, or was, in fact, by the very transaction, applying them to the extinguishing of his own private debt. The great difficulty has been t^ *522 determine how far the purchaser dealt at his peril, when he knew, from the very face of the proceeding, that the executor was applying the assets to his own private purposes, as the payment of his own debt. The latter and the better doctrine is that in such a case he does buy at his peril; but that if he has no such proof or knowledge, he is not bound to enquire into the state of the trust, because he has no means to support the enquiry, and he may safely repose on the general presumption that the executor is in the due exercise of his trust.”
In Graff &c. v. Castleman &c., 5 Rand. 195, Judge Carr, in an opinion in which Judges Cabell, Coalter and Green concurred, reviewed the cases on the subject, at the conclusion of which review, he said : “The latest English case that I have met with is Keene v. Robarts, 4 Mad. Ch. R. 332. There the vice-chancellor gives the result of an examination of all the cases, thus: ‘Every person who acquires personal assets by a breach of trust or devastavit in the executor, is responsible to those who are entitled under the will, if he is a party to the breach of trust. Generally speaking, he does not become a party to the breach of trust by buying or receiving as a pledge for' money advanced to the executor at the time, any part of the ^personal assets, whether specially given by the will or not; because this sale or pledge is held to be, prima facie, consistent with the duty of an executor. Generally speaking, he does become a party to the breach of trust, by buying or receiving in pledge any part of the personal assets, not for money advanced at the time, but in satisfaction of his private debt; because this sale or pledge is, prima facie, inconsistent with the duty of an executor. I preface both these propositions with the words generally speaking, because they both seem to admit of exceptions. ”
Other cases on the subject have been decided by this court, but it will be necessary to notice only a few of them, which have a strong bearing upon the case now under consideration. They are, Fisher v. Bassett, &c., 9 Leigh 119; Pinckard v. Woods, &c., 8 Gratt. 140; and Cocke v. Minor, &c., supra.
In Fisher v. Bassett, the case is thus stated by the reporter: “An administrator takes a bond to himself individually for a debt due to his intestate’s estate, payable at a distant day, and then sells the bond at a discount of twenty-five per cent, to an assignee, who knows that the consideration of the bond was a debt due to the intestate’s estate, but is informed, and so informed, as to justify him in believing that the administrator has acquired the full property in the bond in his own right — Held, this is such a dealing with the assets of the intestate’s estate, such a concurrence of the assignee with the administrator in his appropriation of the assets to his own use, as to throw the burden of proof of the fairness of the administrator’s conduct on the as-signee ; and if the administrator had not purchased the claim from the next of kin, or had not made such advances as to justify him in appropriating it to himself, the assignee cannot in equity *avail himself of the transfer. ’ ’ ‘ ‘The sale of the bond at so large a discount, ” said Tucker, P., “was itself prima facie a devastavit, and the burden of proof is upon Scott or Eisher, that the necessities of the estate, and not those of the administrator, required the sacrifice. ’ ’ He spoke of the sale as having been made “at the ruinous rate of twenty-five per cent., without evidence, as far as yet appears, of the necessities of the estate requiring such a sacrifice.” Parker, J., agreed in the opinion that there was such a dealing with the assets as to render the transfer of the bond prima facie void. “When Eisher bought the bonds,” said the judge, “at so much less than their value under the circumstances existing in the case, he took on himself the risk of showing either that Scott was the real owner of them, or that the necessities of the estates justified the sacrifice. ’ ’
In Pinckard v. Woods, &c., the case is thus stated by the reporter: “An executor, who is also a legatee of one moietj^ of his testator’s estate, sells the property and purchases about one-half of it himself. He takes bonds from the other purchasers of the other part of the estate, which show upon their face that they are executed to him as executor. Afterwards, he sells these bonds at a discount of from eighteen to twenty per cent., the purchaser knowing that the liabilities of the estate of the testator were very inconsiderable, and that the sale of the bonds was not necessary for any purposes of the administration. At the time of the sale the executor was solvent, and his solvency was not questioned; but he afterwards failed, without paying the legatees of the other moiety of the estate. Held, that the sale of the bonds at such a discount, when the circumstances of the estate did not require it, was a devastavit by the executor ; and that the purchaser, having ^purchased with a knowledge of the fact, will be compelled to pay the amount of the bonds (if they do not amount to more than the devastavit of the executor) to the legatees. Or if they have been paid by the sureties of the executor, the sureties are entitled to be substituted to the rights of the legatees.” Baldwin, J., delivered the opinion of the court, in which all the members of the court, four in number, concurred. He said : ‘ ‘It is the duty of an executor not to sell, but to collect, the debts due to the estate of his testator, including those arising out of sales of goods made by the executor in the course of his administration ; and if he sells such debts at a price below their value, he thereby commits a devastavit, unless he makes it appear that such sale was manifestly required by the interests of the estate; and this he can never do without showing, in the first place, that the proceeds thereof have been applied to the purposes of the' estate. ” * * “And the purchaser himself so - acquiring such *523 debt at a profit, if he has reason to believe, at the time, that the same belongs to the estate, and is so disposed of by the executor for his individual uses, thereby concurs in such fraudulent breach of trust by the executor, and therefore incurs the like liability. ’ ’ The bonds were on their face payable, to the administrator in that character. ‘"The appellant had, therefore, the best reason to believe that the bonds belonged to the testatrix’s estate when he purchased them from the administrator at a discount of eighteen or twenty per cent. ; and from the profit he was thus allowed to make, he had good reason to believe that the administrator was selling them for his own individual uses, a fact which the result and the condition of the estate have abundantly shown. Under these circumstances, it was incumbent on the appellant to stay his hand until he should ascertain, by *the requisite enquiries, that the sale was to be made for the purposes of the estate, and the sacrifice to be incurred indispensably necessary to prevent some still greater sacrifice.” “If he had made the enquiry, he would have ascertained that the condition of the estate did not require the sale of the bonds. But, in truth, he knew it, without the necessity of enquiry, ’ ’ &c. “It is no valid defence for the appellant, that at the time he purchased the bonds it was his belief, and that of the public generally, that the administrator was then in solvent circumstances. Such belief may have induced him to look to the individual responsibility of the administrator as a guarantee against the failure of his speculation, and to that responsibility he must still look; and it having proved abortive, furnishes no reason for throwing the consequent loss upon those whom he has aggrieved by his intermeddling with the affairs of the estate, from no other motives than the desire of gain to himself, and careless as to its effects upon the rights of others. ’ ’
In Cocke v. Minor, &c., the question was as to the liability of a purchaser from a trustee at a heavy discount (twenty per cent.) of bonds belonging to a trust fund. Judge Bouldin in delivering the opinion of the court said: “That the conversion into money by a trustee of well secured bonds belonging to a trust fund by a sale thereof at a large sacrifice, to a purchaser with full notice of the trust, does constitute such an improper dealing with, and devastavit of, the trust subject, as will render both trustee and purchaser prima facie responsible therefor, is a proposition about which, at this day, there can be no doubt;” and the cases of Eisher v. Bassett, &c., and Pinckard v. Woods, &c., supra, were referred to in support of the proposition, and fully stated in the opinion. After referring to an allegation *in the answer of the purchaser, that from such information as he had he believed the trustee wanted the money for proper purposes, without stating what that information was, or, indeed, that he had any, except from the trustee himself ; the court further said: “Admit it all to be true, and admitting further, what is neither shown nor even alleged, that this information was of such character as to justify the belief arrived at, still, under the principles established in the cases referred to, that belief, however it might acquit him morally, would not be enough to discharge him from legal responsibility. He was acting at his own risk, and would be bound to show that what he thus believed was in fact true. Vague impressions of that character cannot be received as a ground on which the right of others are to be bartered away.”
The case of Hunter v. Lawrence's adm’or, &c., 11 Gratt. 111, is an important case, and was much referred to in the argument. There may be occasion to state the purport of it, but for the present, at least, it is not deemed necessary to do so.
We will now consider the case of each of the said three parties, Heal, Jones and Barksdale, separately; and,
Eirst, as to Heal. His case comes within the principle laid down in the cases of Fisher v. Bassett, &c., Pinckard v. Woods, &c., and Cocke v. Minor, &c., and he is clearly liable for the amount of the bonds purchased by him, unless he is discharged from such liability by laches and lapse of time, or his certificate in bankruptcy, a question which will be considered presently. He was not guilty of actual fraud in making the purchase; but, according to the cases referred to, he was guilty of constructive fraud, which was sufficient to implicate him as a participant in the devastavit, certainly ^committed by the executor. The bond was payable to the executor in that character, which gave express notice to the purchaser that it belonged, in its origin at least, to the testator’s estate; and he bought it from the executor at a discount of eighteen per cent. Hothing but the necessities of the estate could have justified the executor in making such a sale, unless the bond had become the individual property of the executor by his advancements made on account of the estate or otherwise. To be sure, the purchaser did not know the condition of the estate, and was informed, and no doubt believed, that the estate was indebted to the executor, and that the sale was made on that account. But the purchaser, having made the purchase under the circumstances aforesaid, made it at his peril, and subject to the risk of the sales having been properly made, or of the amount of the bonds being fully accounted for by the executor to the estate. Heither of which turned out to be the case. If he had made enquiry before he made the purchase, he could easily have ascertained that the sale would be a breach of trust and a devastavit by the executor. He ought to have made such enquiry, but he did not do it. He relied on the solvency of the executor, and his ability and willingness to make everything right; and he did not think it worth while to trouble himself in making enquiries about the estate. Having been disappointed in that expectation, he cannot justly com *524 plain that he must be regarded as particeps criminis in the wrong of the executor. In a controversy involving- the question of a devastavit by the executor in a sale of bonds belonging to his testator’s estate, and of the participation of the purchaser therein, the burden of' proof devolves on the purchase^ to show that the duty of the executor required the sale on the terms on which it *was made, or that the bonds belonged to him individually, or at least that he has fully and properly accounted for the amount of the bonds, &c., to the persons entitled thereto. We cannot distinguish this case from that of Pinckard v. Woods, &c., upon the question whether the purchaser participated in the devastavit committed by the executor in the sale of the bonds; and we therefore decide that he did so participate, and is liable accordingly, unless he is discharged from such liability by laches and lapse of time, or his certificate in bankruptcy. Whether he be so discharged or not, we will now enquire; and 1st, as to laches and lapse of time. Upon this question we have had some difficulty. The sale of the bonds was made in 1859. The executor was then a man of large property and undoubted solvency; and so continued to be till he removed- from the state, in 1862. There can be no doubt but that during that period he had ample means to pay the amount of the bonds, and could have been compelled to do so, either by the legatees, or by the purchasers, if the former had claimed to hold the latter liable. If the appellees, Clark and Holland, had not become sureties of the executor in his new executorial bond, it is not improbable that the executor would have been compelled to account for and pay the amount with which he was chargeable to the legatees. Had Tuck and the said sureties who caused the executor to be held to bail in Tuck and wife’s suit, in November 1862, enforced the liability of the sheriff and his securities for taking insufficient bail, the debt of the executor to the estate of his testator might, in that way, have been satisfied. It does not appear and it is not probable that it was pretended by anybody that the purchasers of any of them had incurred any liability to the legatees, or anybody else, by reason of their purchases, until about the time the suit was brought against them by Clark and Holland, in 1869, nearly ten years after the purchases were made, and seven after the executor had removed from the state. Nor does it appear that during that period an idea of any such liability occurred to any of the said purchasers. It does not appear that they concealed the fact that they had become such purchasers, or that the fact was unknown to the public. Shortly after the maturity of the bonds respectively, or those assigned to Neal (the one assigned to Barksdale having been paid), actions were brought upon them and judgments recovered in the County court of said county, in the name or for the benefit of said Neal or said Jones. It must have been known both to the legatees and the sureties, Clark and Holland, at least before the said executor was held to bail as aforesaid, that he had received, or become accountable for the amount of said bonds. If the executor had not sold the bonds he would no doubt have collected them at or after maturity, and the same loss would probably in that case have occurred as has actually occurred to the legatees or sureties, on account of the default of the executor in regard to the said bonds. It may reasonably be said, therefore, that the loss is due rather to the laches and neglect of the legatees or sureties, or both, than to the acts or defaults of the purchasers.
But in view of all the circumstances of the case, we have concluded that the purchasers, if they have made themselves liable on account of their purchases, ought not to be discharged from such liability by reason of the supposed laches and neglect of the legatees and sureties. If they are liable, it is because they are wrong-doers, and they cannot thus apportion their *own wrong, or escape liability therefor by thus throwing the loss upon those who have been guilty only of neglect at most. The purchasers ought to have taken care of themselves, and not to have trusted, as they did, to the ability and willingness of the executor to save them. One of the legatees continued to be an infant until after the institution of the suit against the purchaser, and to her, at least laches is not imputable. The intervention of the war, the existence of stay laws, and the legal suspension from time to time, of the act of limitations, seem to obviate the effect of lapse of time in the case. In Pinckard v. Woods &c., the court said: “Nor does the statute of limitations afford protection to the appellant, for the appellees have no remedy but in equity, which will not allow its application to such a case as this.” The same may, perhaps, as well be said in regard to the defense of laches and lapse of time in this case.
2ndly, as to Neal’s certificate in bankruptcy. The 33d section of the Bankrupt Act declares, ‘ ‘That no debt created by the fraud or embezzlement of the bankrupt, or by his defalcation as a public officer, or while acting in any fiduciary character, should be discharged under this act. ’ ’ The purchaser, Neal, can be made liable in this case only upon the ground of his having fraudulently participated with the executor in a devastavit committed by the latter. He must, therefore, have been guilty of fraud, to make him liable. A debt due by him on that account must be a debt created by fraud; whether the fraud be actual or implied. The act does not say “actual” fraud, or “moral” fraud; or qualify the word by any other adjective. It uses only the generic word fraud, which we must construe in its general sense, unless the context require a different construction, which we think it does not. Certainly *if the purchaser had actually colluded with the executor to commit a devas-tavit, his fraud would have come within *525 the meaning- of the act. Why does it not come within the meaning, as it certainly does within the letter of the act, when he has so dealt with the executor, in regard to the assets of his testator, as to make him liable for the amount of those assets, upon the ground of his having been guilty of an implied or constructive fraud? It has precisely the same effect with actual fraud, in regard to the measure of his liability therefor. Why has it not the same effect in regard to his discharge in bankruptcy? Can this question of discharge be made to depend upon the degree of aggravation of the fraud? We therefore think that this is a “debt created by the fraud of the bankrupt,” within the meaning of the bankrupt act, and that it is not discharged under the said act. This makes it unnecessary to decide, and we do not decide, whether it is a debt created by the bankrupt while acting in a fiduciary character, in the meaning of the act.
It may be proper, in this connection, to notice further the case of Hunter v. Lawrence’s adm’r, &c., before referred to, in which it was held that even if the party who had received the bond from the guardian in that case could be made responsible to the ward, he was not responsible to the sureties. From which it may be, and indeed was, argued in this case that the purchaser, even though answerable to the legatees, is not answerable to the sureties. It seems to be a sufficient answer to that view to say, that the party who had received the bond from the guardian in that case w-as guilty of no fraud, actual or constructive, and was a bona fide purchaser for full value and without notice. In Pinckard v. Woods, &c., the suit was by the sureties, who had paid the amount of the bonds to the legatees; and this '^court held that the sureties were entitled to be substituted to the rights of the legatees. For the same reason, they would have been entitled before payment, to maintain a suit quia timet.
Secondly, as to Jones. His case differs from that of Heal in several important respects. Like Heal, he considered the executor a man of large property and undoubted solvency, and that he would be able and willing to meet all his engagements; and, like Heal, he knew nothing about the condition of the testator’s estate, nor whether its emergencies were such as to require or authorize the executor to sell the bonds of the testator at a discount. But, unlike Heal, he did not deal with the executor, nor see how the executor could have anything to do with the sale of the bonds by Heal to Jones. There was no connection nor understanding between Heal and Jones in regard to the purchase of the bonds by Heal from the executor. They were certainly not so purchased for Jones, nor, so far as the record shows, with his knowledge; nor had Jones any interest whatever in that purchase. He found the bonds in the hands of Heal, with an assignment thereon to him from the executor, expressed to be for value received. Heal proposed to sell them to him ; and believing, and having good reason to believe, that they belonged to Heal, and that Heal had a perfect right to sell them, he accordingly bought them at a moderate discount, and they were regularly assigned to him “for value received” by Heal; and, after their maturity, he promptly brought action upon them for his benefit, and recovered judgment for, and received the money, without being questioned by any body as to his right to do so until 1869, when this suit was brought.
Whefi Jones bought the bonds of Heal he did not *know on what terms Heal had acquired them from the executor. They might, for aught he knew, have been assigned at their par value, in payment of a debt due by the testator’s estate to Heal; or the emergencies of the estate might have required them to be sold at their market value by the executor; or they might have become the property of the executor in payment of a debt due to him by the estate or the legatees, or of advances made by him for either of them. That they were payable to the executor as such, did not show that he did not part with them lawfully. The legal title to them was vested in him, and he had the right, and it might have been his duty, to sell them, as it certainly would have been to collect them at maturity, if not sold before. The duty of a purchaser from an executor, of a bond payable to him as such, to make enquiry as to the propriety of the sale does not arise from the fact that the bond is so payable. The only effect of that fact is to inform him that the bond is a part of the assets of the testator. And an executor may lawfully sell the assets, whether they consist of a bond or anything else ; and a fair purchaser cannot be held responsible, though he make no enquiry as to the propriety of the sale. That is a question to be decided by the executor, to whose discretion the testator and owner of the property has referred it, and persons may lawfully trust him, and purchase assets from him without any enquir3q if the conduct of such persons in the transaction be fair. Confidence being placed in the trustee “by the person who had the sole right to dispose of the property at his will,” as was said by Marshall, C. J., in Garnett v. Macon &c., 2 Brock. 185, 231, “no other can question the correctness of his proceeding, or can be justifiable in suspecting an intention to violate the trust. He has no *right to suspect that the person who has been selected by the testator for its execution, will violate the trust reposed in him, and no collusion between him and the trustee ought to be implied from equivocal acts.” Davis v. Christian, &c., 15 Gratt. 11, 46.
If a person buying a bond from an executor, payable to himself as such, have good reason to believe that the executor intends to misapply the proceeds of sale, and thus commit a devastavit, it is incumbent on him to stay his hand, until he can ascertain by the requisite enquiries that the sale *526 is to be made for the purposes of the estate, and is such a one as the executor may make consistently with his duty. If such a bond be offered to be sold by an executor at a heavy discount, as, for instance, eighteen or twenty per cent., that fact affords to the person, to whom the offer is made, good reason to believe that the sale is intended to be made for the use of the executor, and not for the benefit of his testator’s estate; and such person cannot safely make the purchase until he h'as first ascertained that it will be proper for the executor to make the sale. It has been decided in no case that a sale of a bond, at a discount however small, will afford sufficient reason to believe that a devastavit is intended by an executor. A sale of a bond at par, or abating only the legal discount for the time the bond has to run to its maturity, would certainly afford no reason for believing that a devastavit is intended; nor, we imagine, would a very small additional discount. It is often to the interest of an estate, and agreeable to the legatees, for such a sale to be made, especially in a case in which a bond has a long time to run. Suppose a bond, which would probably have to be collected by suit, is sold at a discount, not more than equal to the ordinary expenses of collecting such a bond, would such a sale be a devastavit *in the executor? The rule in regard to the sale of any property by an executor, including, we suppose, as well bonds as other property, is that if it be sold at such a gross undervalue as to afford good reason to believe that the executor intends to commit a devastavit, the purchaser will buy at his peril, and ought, for his own safety, to make the necessary enquiries. But who can say that a sale of a bond at a very small discount, the smallest at which it could possibly be sold, would be a sale at a gross undervalue? In the three cases before referred to, which are the only cases we have seen on the subject of a sale of bonds by an executor, the sale was spoken of as at a “sacrifice,” and sometimes as at a “ruinous sacrifice.” In Fisher v. Bassett, &c., the sale was at a discount of twenty-five per cent. In Pinckard v. Woods, &c., it was at a discount of eighteen to twenty per cent. In Cocke v. Minor, &c., it was at a discount of twenty per cent. In this case, the sale to Neal was at a discount of at least eighteen per cent. But the sale by Neal to Jones was at a very small discount; not as much probably as one-half of the last named sum; and Neal proves that it was low. If therefore the bonds had been bought by Jones of the executor, instead of Neal, we could not say that the bonds were sold at a gross undervalue, or at a sacrifice. Both of the bonds had some time to run when sold, and one of them, the larger, more than a year. Actions had to be brought upon both of them. A ong tl me elapsed before they were collected; and, after paying the expenses of collection, Jones probably received but little if any more than six per cent, interest on his money. To make him now pay the whole amount of the bonds with interest till payment, would be to impose a very heavy penalty upon him, certainly one exceeding his offense, whatever that may be, and far *exceeding any loss which an3rbody can have sustained from his act, for nobody, in fact, can have sustained any such loss at all. The cause of the loss was complete before Jones became a purchaser. But Jones did not buy the bonds from the executor, and therefore does not come within the principle of the cases referred to. He was a bona fide purchaser for value and without notice from Neal, who was apparently a bona fide assignee for value from the executor, and had possession of the bonds, and duly assigned and delivered them to Jones. He, Jones, gave full value for them, as much as could possibly be gotten in the market, and had no notice whatever of any imperfection in the title. He obtained judgments on the bonds, and collected the money without any question as to his title. Having the legal title to and possession of the subject, and at least as much equity as anybody else can have, there can properly be no recovery against him on account of the bonds. The only evidence which can be said to tend to implicate him in the breach of trust of the executor is, that Neal was in the habit of buying bonds at a greater discount than legal interest, and that Jones knew the fact. A vague suspicion arising from such a circumstance, is certainly not constructive notice, much less is it sufficient to make out a case of constructive fraud. If Jones was bound to make enquiry, so also would have been any subsequent assignee, however remote, and even the obligors themselves, in order to be safe in paying the bonds. An assignee of a bond for value and without notice, takes it subject to all equities of the obligor, but not to any equity of a third person; and even the equities of the obligor must be asserted in due time, and before the recovery and collection of the money.
We therefore think the decree against Jones’ executors *is erroneous, and that as to them the bill should have been dismissed.
Thirdly, as to Barksdale. A bond of Raleigh White for $1,000, dated the 19th day of May, 18S8, payable on the first day of July 1859, to Edmund Fitzgerald, Jr., executor of William Fitzgerald, Jr., being one of the bonds given by White for the land bought by him of said executor, was, on the 21st of March, 1859, assigned by the said executor to said Barksdale, who paid the full amount of the bond to the said executor, abating legal discount for the time the bond had to run, and deducting five per cent, on the balance; and on the day after said assignment, to wit: the 22nd of March 1859, the amount of said bond was paid by said White to said Barksdale, abating only the legal discount as aforesaid. Barksdale says in his answer, that ‘‘the said assignment was made to enable this respondent to collect the said bond. The said Edmund *527 Fitzgerald and Raleigh White were upon unfriendly terms. The said White was a singular man, and preferred the bond to be assigned to this respondent. This respondent agreed to collect the bond for a commission of five per cent.,” &c. “The said Edmund Fitzgerald was at that time possessed of a good estate, and in good credit, and this respondent had no suspicion that he intended to misapply the assets of his testator.” “This respondent was, and is at this time, a practicing attorney, and supposed that he had a perfect right to collect any debt for the said Edmund Fitzgerald. and pay it over to him,” &c. The foregoing is the substance of the transaction, as stated in the answer of Barksdale, upon which statement the question of his liability depends. The court below decreed that he was not liable, and dismissed the bill with costs as to him, and we think there is no error in the decree in *that respect. There was no contrivance between the executor and Barks-dale to commit a devastavit in regard to the bonds of White. If White had paid the money directly to the executor, instead of paying it through Barksdale, that would certainly have been a lawful payment; and yet the same loss would in that case have occurred as has occurred to the estate from the conversion of the money to the executor’s own use. But the executor and White were on unfriendly terms, and the latter preferred not to settle the matter with the executor in person. Barksdale, an attorney, was therefore employed by the executor, on the usual terms, to collect the bond; and White, being “a singular man,” preferred that the bond should be assigned to Barksdale; no doubt considering that that would be the best evidence of Barksdale’s right to receive the money. This may have been an unreasonable and awkward mode of settling the matter, but certainly the evidence is not sufficient to convict Barks-dale of a fraud; which is necessary to make him responsible as a party to the devastavit of the executor. A fraud should not be presumed, but must be plainly proved. The most that can be said of the evidence is, that it may raise a question, whether the five per cent, allowed to the attorney for collection ought to be allowed as a credit to the executor in the settlement of his account. Even if the transaction be considered as a sale of the bond by the executor to Barksdale at a discount of five per cent., it does not follow that Barksdale committed a fraud, actual or constructive, which would render him liable; as what we have already said in regard to Neal and Jones sufficiently shows.
There are some technical questions in this case which ought to have been before noticed ; but as they were not, they will now be briefly disposed of.
*lst. We think the court erred in striking out the demurrer to the bill, which was sufficient in form and substance. Code of 1860, p. 712, \ 30, and p. 752, $ 1. But this error was not to the prejudice of the defendants, as they were entitled to all the benefit at the hearing which they could have derived from action on their demurrer.
2dly. The bill was not multifarious. It was filed by the sureties of an executor against the executor and the different purchasers from him, to compel them to account for the assets of the testator in regard to which it was charged that the executor had committed a devastavit to which the purchasers were parties. It was obviously proper, and indeed necessary, that they should be united in the same suit, though the purchases were different.
3dly. The bill is not a cross-bill, but an original bill, quia timet; which the sureties had a right to file, though they had paid nothing, and nothing had been recovered against them, as such. They had been made parties to the suit brought by the legatees against the executor, and a decree was about to the obtained in that suit against both principal and sureties. In this state of danger and apprehended loss, the sureties, considering the purchasers of the bonds from the executor liable to account for the same, by reason of their fraudulent participation in a devastavit charged to have been committed by the executor in regard to the sale of the bonds, had an unquestionable right to file their bill, quia timet, against the said executor and purchasers, to compel them to pay the amount for which they might be liable as aforesaid,, in ease and exoneration of the sureties.
4thly. Though the bill of the sureties was an original, and not a cross-bill; yet the court did not err, in Regarding the proceedings in the suit of the legatees against the executor and his sureties as evidence in the suit of the srireties against the executor and purchasers. The record in the former was made an exhibit in the latter suit, and the purchasers were called on in the latter suit to aid the sureties in the defense of the former suit, in which the executorial accounts had not been finally settled, nor any depositions taken. There was a prayer in the bill in the latter suit that both cases might be heard together, and that any decree which might be rendered in the former suit, in favor of the legatees against the sureties., might be rendered first to be satisfied by the purchasers, to the extent of any amount of testator’s assets which they, or either of them, might have illegally acquired. And though the cases were not actually heard together, yet they might, and no doubt would, have been if any party had desired it. No objection was made to the proceedings in the former suit as evidence in the latter until the case came before this court; when it was too late to make the objection for the first time. If it had been made in the court below,' it would at once have been obviated by retaking in the latter suit the accounts and depositions which had been taken in the former.
Sthly. Coalman T). Bennett, administrator de bonis non, with the will annexed, of William Fitzgerald, having died before the *528 final decree was rendered, and all the debts of said testator’s estate having been paid or provided for, and there being nothing due to it, except what was recovered in this suit, the court did not err in making a final decree without having a personal representative of said testator’s estate before the court.
Having noticed and disposed of all the questions, *both of form and substance, arising in the case, we think the decree appealed from ought to be reversed in part and affirmed as to the residue, in conformity with the foregoing opinion.
The decree was as follows:
The court is of opinion, for reasons stated in writing and filed with the record, that Richard Jones, the testator of the appellants Ranghorn Scruggs and Mansel T. Smith, did not participate in, nor become accountable for, any devastavit committed by the appellee Edmund Fitzgerald, executor of William Fitzgerald, deceased, of the assets of the latter in regard to the bonds of Archer B. Womack -and James M. Adams to said Edmund Fitzgerald, executor as aforesaid, assigned by him to Griffith D. Neal, and by said Neal to said Jones, and in the decree appealed from mentioned; that the said Scruggs and Smith, as executors of the said Jones, are not liable to pay the amount of the said bonds or any part thereof, out of the assets of their said testator or otherwise, to any person or persons whomsoever; and that the said decree so far as it is in conflict with the foregoing opinion, is erroneous; but there is no other error in the same. Therefore it is decreed and ordered, that the said decree, so far as is above declared to be erroneous, be reversed and annulled; that in all other respects it be affirmed; and that the appellees, Clark and Holland, pay to the appellants their costs by them expended in the prosecution of their appeal aforesaid here. And this court proceeding to render such decree as the said Circuit court ought to have rendered, in lieu of so much of the decree of said court as is hereby reversed as aforesaid, it is further decreed and ordered that the bill of the complainants in the court below be dismissed as *to the said Jones and his said executors; and the said’complainants pay to the said executors the costs by them and their said testator about their defense in this suit in the said Circuit court expended.
Which is ordered to be certified to the said Circuit court of Pittsylvania county.
After the decision of the case, Neal and Clark and Holland applied for a rehearing; when the court made the following order:
The court, in view of the “novelty and great importance” of the question mentioned in the petition of Griffith D. Neal, as to the “effect of his discharge in bankruptcy in bar of the demand preferred against him” in this cause, is of opinion that the case ought to be reheard upon tljat single point before a full court; but the court is of opinion that the case ought not to be reheard upon any other point arising in the cause. Therefore it is ordered that a rehearing be granted upon the first named point as aforesaid, but that the petition for rehearing be denied in all other respects.
The rehearing was before a full court, and was argued by Carrington and Page, for Neal, and J. Alfred Jones, for Clark and Holland.