MONCURB, J.
Bet us first enquire, what interest the appellant Davis has in the tenement in controversy, regarding it as real estate, unaffected by any partnership, or by the power of sale contained in Josephus B. Colton’s will.
He is certainly entitled to the undivided moiety of Henry Clarke. He is also entitled to the interest of Abby Colton in the other moiety. By her will she empowered her executors to sell all her real estate and invest the proceeds of sale in other productive real estate, or in government stocks. The execution of this power devolved on Henry Clarke and William J. Clarke, her only qualified and acting executors. They duly executed the power by joining in the sale and conveyance to Davis. He was not bound to see to the application of the purchase money. If it was misapplied with his participation or knowledge, he might be liable, as for a fraud, to persons claiming under her will, but to no other person. So far as this case is concerned, Davis must be considered as entitled to her interest in the property. What was that ^interest? She was entitled under the will of J. B. Colton her husband to one-third or three-ninths of his moiety. And she became entitled, by the deaths of their three children in her lifetime, to four of the remaining six-ninths, as one of the heirs at law of said children, subject only to any interest of P. H. Pitzhughas tenant by the curtesy of his wife Hannah Maria’s two-ninths. Whether he had such a seizin of the said two-ninths during the coverture as to give him any such interest, it is needless to enquire. Abby Colton’s interest in the property, then, was seven-ninths of a moiety, subject only as aforesaid. And, in the view we are now taking of the case, Davis acquired by the sale and conveyance to him an absolute estate in the entire property, except two-ninths of a moiety, to which John J. Shuble and Elizabeth J. his wife were entitled in her right as collateral heir at law, ex parte paterna of Sarah Ann, the survivor of the said three children, who died under age; and except any interest of P. H. Pitzhugh as tenant by the curtesy of two other ninths as aforesaid. In that view of the case, the decree is certainly erroneous in directing a sale of the property, unless the appellant should pay the whole amount of the purchase money and interest into bank.
But let us now consider the case in connection with the partnership of Colton & Clarke, and the power of sale created by J. B. Colton’s will.
It is a general rule, that a partnership, whether of definite or indefinite continuance by the terms of its creation, is dissolved by the death of one of the partners. It may be continued longer by express agreement between the partners, or under the provisions of the will of the deceased partner, and with the consent of the surviving partner. In the latter case, however, the testator’s assets are not generally liable under all circumstances for the debts of the continued partnership.
*The case of Hankey v. Hammock, before Lord Kenyon, when master of the rolls, reported in a note to 3 Madd. R. 148, so far as it may be thought a decision to that effect, has been overruled by subsequent cases, and especially b3T Bord Eldon in Ex parte Garland, 10 Ves. R. 110. See also Ex parte Richardson, 3 Madd. R. 138, 157; Thompson v. Andrews, 1 Myl. & Keene 116, 6 Cond. Eng. Ch. R. 525; Pitkin v. Pitkin, 7 Conn. R. 307, and Burwell v. Mandeville’s ex’or, 2 How. U. S. R. 560. If the testator merely direct that the partnership be continued after his death, his responsibility will be limited to the funds already embarked in the trade. But he maj' extend his responsibility further, and make it cover his whole estate if he chooses to do so. It has been said, however, “that nothing but the most clear and unambiguous language, demonstrating in the most positive manner that the testator intends to make his general assets liable for all debts contracted in the continued trade after his death, and not merely to limit it to the funds embarked in that trade, would justify the court in arriving at such a conclusion, from the mainfest inconvenience thereof, and the utter impossibility of paying off the legacies bequeathed by the testator’s will, or distributing the residue of his estate, without in effect saying, at the same time, that the payments may all be recalled, if the trade should become unsuccessful or ruinous.’’ 2 How. U. S. R. 577.
In this case, the testator .plainly manifested his intention, not only that the partnership should be continued after his death, and his property alreadj' vested in the business remain so invested, but that all his real estate should be liable for all debts contracted in the business, and his executors should be fully authorized to'sell and convey the said estate, to enable the surviving partner to prosecute the said business to greater advantage, or to pay the said debts. The clauses of the *will which relate to the partnership, are the 1st, 4th, 5th, 6th and 7th, which are in these words: [the judge here read them].
By the 10th clause, he appointed his wife Abby Colton, and his brother in law and surviving partner Henry Clarke, his executors, and desired that no security should be required of them as such.
It will be observed that the reason ab in-convenienti, so forcibly assigned by Bord *737 Bidón in Ex parte Garland, and by Judge Story in Burwell v. Mandeville’s executor, for not holding the general assets of a deceased partner liable for the debts of a partnership, continued under the provisions of his will, does not apply to this case; inasmuch as the estate was directed, to be kept together during the continuance of the partnership and no legatee could receive her portion of the estate without at the same time dissolving the partnership as to such portion, and exempting it from future liability.
The effect of the will was not to give to the executors a mere discretion to sell the real estate or not, at their pleasure, during the continuance of the partnership, but to create a trust; to subject the real estate to the risks of the business, and to give to creditors a right to look to it, if necessary, for the payment of their claims, whether during the continuance of the partnership or afterwards. The testator seems to have owned little or no personal estate which was not already embarked in the business, and intended that his whole real estate should be kept together to meet its wants and liabilities during its continuance; except that he gave to each child, on her marriage or coming of age, or at any time afterwards, a right to -withdraw her portion of the estate from the business, which was then to cease as to her, but continue as to the rest. He relied exclusively on the profits of the business during its continuance for the support of his ^family, and directed that at its close the proceeds thereof and all his estate real and personal should be divided in certain proportions between his wife and children. The first clause of the will creates a charge for payment of debts due by the concern at the death of the testator: The fourth, for payment of debts which might arise in continuing the business after his death. The same reason exists for the charge in the one case as in the other.
In pursuance of the provisions of J. B. Colton’s will, the business of the firm of Colton & Clarke was continued after his death, under the same name, by the surviving partner Clarke, with the consent of Abby Colton. According to those provisions, it was to be continued so long as he and she should desire and consent thereto. The parties differ as to the actual period of Us continuance. It must have been determined at the death of Abby Colton in May 1843, if not before. The appellant contends that it was not determined before, and it appears from Abby Colton’s will that she also was of that opinion. It is contended, on the other hand, that the partnership was determined at the end of 1834, w'hen the dry goods of the concern were sold out at auction. But the firm was engaged at Colton’s death, not only in the dry goods business, but also in an extensive agency for the sale of paper for D. & J. Ames of Massachusetts. That agency was part of the business which was authorized by Colton’s will to be continued after his death; and it was accordingly so continued until the death of Abby Colton. Until that event, therefore, the partnership was not determined.
There has been much contrariety and fluctuation of opinion upon the question, whether and to what extent real estate bought with partnership funds for partnership purposes, is thereby converted into personalty. It may now be considered as well settled *that real estate may, in equity, be converied out and out into personalty by the agreement of the partners or the manner in which it is conveyed to them. It may also be considered as well settled that real estate bought with partnership funds for partnership purposes is thereby, at least partially, converted into personalty, though it be conveyed to the partners in their individual names as joint tenants, and though there be no express agreement between them in regard to its conversion. It is converted into personalty to the extent that may be necessary for the purpose of paying the debts of the partnership and adjusting the accounts of the partners inter se. But whether converted to any further extent, or out and out, is a question which seems to be still unsettled and upon which there is much conflict of decision. It is well settled, however, that ever}' such conversion, whether express or implied, complete or partial, is equitable only, and the property can only be conveyed as real estate. “Each partner (as has been said) is required, both at law and in equity, to join in every conveyance of real estate, in order to pass the entirety thereof to the grantee; and if one partner only execute it, whether it be in his own name or in that of the firm, the deed will not, ordinarily, convey any more than his own share or interest therein.” This rule is “founded upon the nature of the property and the provisions of the common law applicable thereto.” Story on Part. § 94.
The tenement in controversy was bought by Colton & Clarke with partnership funds for partnership purposes, and was used for such purposes always after its purchase, until the termination of the business; though it was conveyed to them in their individual names. It was therefore in equity, at least partially, converted into personalty. But it could only be conveyed to a purchaser by a deed executed by them, or by those ^authorized by them to sell and convey the same as real estate. Whatever may have been the interest of Colton in the subject, by his will he authorized his executors to sell and convey that interest. He directed that all his property vested in the business of Col-ton & Clarke should remain under the control of Clarke for the purpose of continuing the business, and to be sold, disposed of and new pui'chases made in like manner as if he were in full life and the partnership were continued. And should it at any time, in the opinion of his executors, be deemed necessary by them to sell any or all of the real estate held jointly by him and Clarke, or by him individually, or jointly with any *738 other person, to enable Clarice to prosecute to greater advantage the said business, or to pay the debts which might be due and owing from the same at any time during its continuance; he desired and fully authorized his executors to sell and convey the same in fee simple for that purpose. This power of sale and conveyance is certainly broad enough to cover his interest in the tenement in controversy. The testator, certainly, could not have intended to withhold from his executors the power to sell and convey his interest in the real estate of the partnership, while he conferred upon them full authority to sell his individual estate, for the purpose of paying the debts of the partnership. The power of sale and disposition conferred on the surviving partner, is referable to the goods embarked in the business. The power of sale and conveyance conferred on the executors, is referable to the real estate, as well of the partnership as of the testator individually; both of which are embraced by the literal terms of the will, and the former is at least as much within the true intent and meaning thereof as the latter.
The executors of J. B. Colton, then, were fully empowered by his will to sell and convey his real estate, '^including his interest in the tenement in controversy, for the purpose of paying the debts incurred in continuing the business of Col-ton & Clarke. This power did not 'cease at the death of Abby Colton, but then devolved on the surviving executor, Henry Clarke. It is laid down in Sug. on Pow. 144, as a principle of the common law, that where a power is given to “executors,” and the will does not point to a joint exercise of it, even a single surviving executor may execute it. The power being given to the executors ratione officii, as the office survives, so may the power. He says that where the power is given to them nominatim, although in the character of executors, it is at least doubtful whether it will survive. Hargrave has maintained that in that case also, as the office survives, by parity of reason, so should the power. And Sugden says, that the liberality of modern times will probably induce the courts to hold that the power survives in every case where it is given to executors. Id. 2 Wms. on Ex. 626. This view is confirmed by the act of assembly, 1 Rev. Code, ch. 104, § 52, which seems to regard a surviving executor as' being invested with the power-in every such' case. 3 Eom. Dig. 275 and ’6, marg. In this case the power is given to the executors, not nominatim, but by their official designation only, and clearly survived. That a discretion is given to the executors in regard to the exercise of the power, did not prevent it from surviving. See Brown v. Armistead, 6 Rand. 594.
At the time, therefore, of the sale and conveyance to the appellant of the tenement in controversy, Henry Clarke, as surviving executor of J. B. Colton, had authority to sell his testator’s interest therein for the purpose of paying the debts of the continued firm of Colton & Clarke. And the appellant maintains, that in fact the sale was made for that purpose, and the purchase money was applied accordingly. The evidence *seems to sustain this position, to the extent at least of the greater part of the purchase money.
The facts on this subject appear briefly to be these: Colton & Clarke owed a large debt to D. & J. Ames, the balance of which, on the 14th of April 1843, about the period of Abby Colton’s death, was eleven thousand eight hundred and fifty-seven dollars and sixty-five cents. It does not appear that there were any new dealings after her death between Henry Clarke and D. & J. Ames. Payments were made on account of this debt by Henry Clarke, from time to time, both before and after the death of Abby Colton. To obtain the means for making such payments, Henry Clarke exchanged the notes of Colton & Clarke with Davenport, Allen & Co. for their notes or drafts, which were discounted at bank. In this way Colton & Clarke became indebted to Davenport, Allen & Co. to the extent of ten thousand dollars; and to secure the debt a deed of trust was executed on the tenement in controversy; which, however, was not recorded, but was retained by Davenport, Allen & Co. until payment of the debt, and then returned to Henry Clarke. The balance due on account of that debt at the time of the sale of the tenement to the appellant, was seven thousand six or seven hundred dollars, and was discharged out of the purchase money; the appellant’s check therefor (to wit, nine thousand dollars; having been paid by Henry Clarke on account of Colton & Clarke to Davenport, Allen & Co. It thus appears that, to the extent of that balance at least, the sale was made for the payment of a debt for which the property was liable, and the purchase 'money was duly applied. And though it does not appear that the residue of the purchase money was required for the payment of debts of the concern, yet the purchaser was not bound to see that onlj so much of the estate was sold as was necessary for the purposes of the trust. Sug. Vend. 835-6.
*But for whatever purpose the sale may have been made, or however the money may have been applied, the purchaser cannot be affected, if he acted bona fide. He was not to judge, at his peril, as to the necessity for a sale. He had no means of ascertaining such necessity. That question was properly referred by the testator to the opinion of his executors, who had the means of deciding it. Eor the correctness of that opinion, strangers who might become purchasers were not held by him responsible. To have so held them, would have defeated his purpose of having his real estate sold to advantage, if a sale of it should become necessary. Where a trust is for payment of debts generally, as in this case, a purchaser is not bound to see to the application of the purchase money; for he cannot be expected to see to the due *739 observance of a trust so unlimited and undefined. Sag. Vend. 835, 838; Elliot v. Merryman, and the notes thereto, 1 Leading Ca. in Eq. 40, 65 Law Lib. 58.
The only ground, then, upon which, if any, the title of the purchaser can be affected in this case is, that he did not act bona fide ; but participated in a fraudulent breach of trust committed by Henry Clarke, either in the sale of the property or the application of the purchase money. The appellant in his answer does not admit that any such breach of trust vas committed; but if so, denies that Lie had any participation therein, or knowledge thereof. If the sale veas made to pay a debt of Colton & Clarke, and the purchase money was so applied, then there was no such breach of trust. But let it be conceded, for the purposes of this case, that a breach of trust existed; that the sale was improper, and the purchase money misapplied. And then the question is, Did the purchaser Davis participate in the breach of trust? If he did, it is only because he had notice of it at the -time he made the purchase or paid the purchase money. Had he such notice?
"It is contended that he had; first, because the pendency of the suit of Fitzhugh v. Clarke was equivalent to notice, according to the doctrine of lis pen-dens ; secondly, because he or his counsel actually read the record in that case, and was thus informed of the alleged breach of trust; and thirdly, because the other circumstances of the case, which were or ought to have been known to Davis when he made the purchase, were sufficient to show that Clarke was committing a breach of trust.
As to the doctrine of lis pendens, I do not think it can have any application to the case. If the suit of Fitzhugh v. Clarke be such a suit for specific property as the doctrine requires, there has yet been no decree in it for such property. A purchaser pending a suit for specific property from a defendant to the suit, takes the properly subject to any decree which may be rendered for or against it in the suit. And there is generally no necessity for making him a defendant; but the plaintiff, after obtaining his decree, may enforce it against the property in the hands of the purchaser or his assigns. Unless and until such decree be rendered in the suit, the purchaser is unaffected by the doctrine of lis pendens.
But it is immaterial whether the doctrine applies to the case or not, as I think it sufficiently appears from the pleadings and the proofs that the appellant had actual notice of the suit when he made the purchase, and is chargeable with knowledge of ;ill the facts of which the record in the suit, as it existed at that time, would have informed him. So that if it appeared from the facts of which he was thus informed, that the sale was fraudulent on the part of Henry Clarke, then, by making the purchase with such knowledge, he became a party to the fraud. And now the question arises, What information did the record afford, as it then existed ?
*The purchase was made in ffebru-ary 1846. It does not appear when the bills, original or amended, were filed in the suit or Fitzhugh v. Clarke. We have but a meagre skeleton of the record of that suit embodied in the record of this. It appears that the original bill was filed between the 13th of July 1839, the day of the death of the child of JB'itzhugh and wife, and the 25{h of December 1839, the day of the wife’s dealh; as she was a plaintiff in the suit, and the death of the child is mentioned in the bill. If so, the suit must have been negligently prosecuted; for the answers of Henry Clarke and Abby Colton to that bill were not filed before the 2d of January 1843, when they appear to have been sworn to— more than three years after the filing of the bill. Afterwards, and after Abby Col-ton and all her children had died, an amended bill was filed, to which Henry Clarke filed an answer, which ivas sworn to on the 12th of June 1844. An order of account was afterwards made in the suit, but at what precise time docs not appear. It is not copied in the record, and we can only infer what it was from the report of the commissioner. That report bears date on the 30th of May 1850 — more than four years after the said purchase; and shows thal the execiition of the order of account was not commenced until the 23d of October 1846 (the date of the commissioner’s notice to the parties), which was eight months after the purchase. In determining, therefore, what information the purchaser could have derived from the record of that suit, we must throw out of view the commissioner’s report and the accounts returned therewith, and look only to the bills and answers. What facts did they disclose?
Dor some time after the intermarriage of ffilzhugh and wife, on the 25th of October 1837, he seems to have acquiesced in the continuance of the partnership. But shortly before his wife’s death on the 25th of December "1839, he brought the suit of Fitzbugh v. Clarke, for the purpose of obtaining her proportion of the estate of J. B. Colton, under the 6th clause of the will. That was the only object of the suit. The 6th clause does not provide for a termination of the business when any child should require-her part; but only that the business should cease as to such child, and be continued as to the rest. The bill, while it requires the plaintiff’s part of the estate, is perfectly consistent with a continuance of the business as to the rest. It charges that Ditzhugh had made repeated applications to Clarke to have his portion of the estate delivered to him, “wishing to have the means of advancing himself in business.” But it makes no complaint of any waste of the estate or mismanagement of the business by Clarke, and asks for no injunction nor for the appointment of a receiver. It does not prelend that there had ever been any cessation of the business by a public sale of the stock of dry goods, or otherwise; but on the contrary, admits that the partnership had continued until the in *740 stitution of the suit, and was still in existence, and prays for an account of its continuance down to that time. It mentions the tenement in controversy as part of the real state of Colton & Clarke, and states that their business was that of dry goods merchants, and was prosperous, and that a large amount of money appeared by the books to have been due to them at Colton’s death. The answer of Clarke to the original bill admits that the business of the firm was principally that of dry goods merchants, and was prosperous, but to what extent, could only be ascertained by a fair settlement of accounts, &c.; and that under the powers given in the will and with the consent of Abby Colton, he had continued and still continued to conduct the business of the copartnership for the joint benefit of himself and the estate of J. B. Colton. It states that he had, *in all respects, honestly and faithfully endeavored to comply with the wishes of his testator, as expressed in his will, and was ready to submit the books of the concern, which had always been kept with the utmost exactness, to the examination of any commissioner who might be appointed for the purpose, &c. ; that in conducting the business of Colton & Clarke, he had deemed it most prudent for the last four or five years to restrict that business, and in part to invest the debts and money in stocks of various descriptions; that in one instance he purchased for the concern a piece of property opposite Rocketts, called the Coalyard island, which, with the improvements thereon, cost ten thousand and fifty-five dollars; and that these stocks and real property, as well as all the other property of the concern, in consequence of the universal depression existing at the time, would, if forced into market, produce heavy and irreparable loss, which would fall, one-half on the respondent, and the other half on the estate of his testator. Abby Colton, in her answer, states, that she had taken no active part in the management of her testator’s estate, having left it to the care and judgment of Clarke her co-executor, in whom she always had, and still continued to have the most perfect confidence; and that the business of Colton & Clarke had been, and s-till was continued, with her consent. The amended bill was filed mainly with the view of reviving the suit against the proper parties after the death of Mrs. Colton and her daughters. It takes the ground (no doubt in consequence of the death of Ritzhugh’s wife, whereby he had become entitled to her personal estate absolutely, and to her real estate, at most only, for life), that a valuable portion of the real estate, including the tenement in controversy, had been paid for with partnership funds, and bought and always used for partnership purposes; and, if it is to be regarded as personal property, claims ’^his wife’s portion "thereof as her administrator. It makes no complaint of waste of the assets, or mismanagement of the business of the con-1 cern, any more than did the original bill; but charges that all the estate of J. B. Col-ton ever since his death had been and still was in Clarke’s possession under the trusts of Colton’s will. Clarke in his answer to the amended bill admits that a part of the real estate, including the tenement in controversy, had been paid for with partnership funds, and bought and used for partnership purposes, but insists that as to the complainant, it should be regarded as real and not as personal estate. He says he is advised that the complainant, never having, during- the coverture, reduced into possession any portion of the real estate to which his late wife may ultimately have been entitled, had no claim as tenant by the curtesy to such portion; and as regards the personal estate proper, he charges that complainant had already been paid his wife’s full share thereof.
I have thus stated, in substance, all the material facts disclosed by the record of the suit of Fitzhugh v. Clarke, as it existed at the time of the appellant’s purchase; and I certainly see nothing in them to inform him that the sale was unnecessary or improper, in discharge of the trust created by Colton’s will, or was fraudulently made for the private purposes of Clarke. If there had been any waste or mismanagement of the estate of Colton, or of the assets of Colton & Clarke, or any well grounded apprehension thereof, the complainant, on showing the fact, might have obtained an injunction and had a receiver appointed. But there was no allegation of any such fact; and, so far as appeared from the record, it was not only the right but the duty of Clarke to continue to execute the trusts of Colton’s will, by selling his real estate whenever deemed necessary by him for the payment of the debts of Colton & Clarke. Green v. Slayter, *4 John. Ch. R. 38. It was neither the object nor the effect of that suit to take the execution of the trust out of the hands of the trustee and transfer it to the court.
Then, was there any thing in the other circumstances of the case, of which Davis had or ought to have had any knowledge at the time of his purchase, to inform him of any fraud or breach'of trust on the part of Clarke?
The evidence of notice ought certainly to be very strong to convict a purchaser of a fraudulent participation in a breach of trust in such a case. Confidence being placed in the trustee “by the person who had the sole right to dispose of the property at his will (as was said by Marshall, C. J., in Garnett v. Macon, &c., 2 Brock. R. 185, 231), no other can question the correctness of his proceeding, or can be justifiable in suspecting any intention to violate the trust. He has no right to suspect that the person who has been selected by the testator for its execution, will violate the trust reposed in him, and no collusion between him and the trustee ought to be implied from equivocal acts.” “If the executor sells to a person who knows that there are no debts, or that *741 all the debts are paid, and that the sale is not a fair execution of the trust, the purchaser may take the property subject to the trust. 2 P. Wms. R. 148, 150. So too, if the executor sells at such undervalue as to indicate fraud, or for payment of his own debt. Crane v. Drake, 2 Vern. R. 616; Scott v. Tyler, 2 Bro. C. C. 430, 477; Andrew v. Wrigley, 4 Id. 125, 130; Hill v. Simpson, 7 Ves. R. 152, 167; Lowther v. Lowther, 13 Id. 95; McLeod v. Drummond, 17 Id. 153, 169. These cases proceed upon the principle that the executor does not sell in pursuance of his trust, but in violation of it, and that the purchaser knowing this fact, aids him in its execution, by making tlie contract. The purchaser is not bound to make '"any enquiry. The general power of the executor to sell protects him in buying; but if he buys with notice that the sale is a breach of trust, the property remains chargeable with it. ’ ’ Id. 238. Field v. Schieffelin, 7 John. Ch. R. 150, wTas the case of a sale by a guardian, of bond and mortgage belonging to his ward before the principal money had become payable. The purchaser was held not to be chargeable. This is a strong case, as it is “not in the ordinary course of the guardian’s administration to sell the personal property of his ward.” Id. 154. “The necessity or expediency of the measure (said Chancellor Kent) rested entirely in the judgment and discretion of the guardian. He was, as between him and the purchaser, the proper and exclusive judge of that expediency. It was not the duty or the business of the purchaser to enquire into the necessity of the assignment, or to see to the application of the purchase money. He had a right to presume, in the absence of all direct and plain proof to the contrary, that the guardian was exercising his power fairly and faithfully, in conformity with his duty. ” “There is no direct or positive evidence that the guardian has in truth misapplied or wasted the infant’s money. It might be inferred from the acknowledged fact of his insolvency, and from the silence of the case; but when it becomes necessary, not only to establish the fact of breach of trust, but of a participation of the plaintiff in the fraud, we ought to have something more decisive than a presumption resting- on such a basis. It is very possible, and consistent with every established fact in the case, that the money received by the guardian from the plaintiff, was duly invested in other property, in the name and for the benefit of the infant, and was left untouched amidst the waste and destruction of his own property. But if the presumption of a devastavit is to be admitted, there is no evidence that the guardian *had any abuse of trust in contemplation when he made the assignment; or, if such were his intention at the time, there is no certain and sufficient proof that the plaintiff knew or had information of that intention, or of any purpose or design in the guardian inconsistent with his duty. The proof on the part of the infant is too lame and scanty to justify the conclusion of any breach of trust in the guardian, in which the plaintiff knowingly partook.” Id. 153. Seealso, Dodson v. Simpson, 2 Rand. 294, in which the doctrine on this subject is clearly slated by Judge Green; also McLeod v. Drummond, decided first at the Rolls by Sir William Grant, 14 Ves. R. 352; and afterwards, on appeal, by Lord Eldon, 17 Id. 153; and other cases cited in the notes to Llliot v. Merryman, supra.
I am aware of no case which appears to be inconsistent with the doctrine as laid down by Chief Justice Marshall and Chancellor Kent, in the cases cited from 2 Brock, and 7 John. Ch. R. In Hill v. Simpson, 7 Ves. R. 152, the assignees of an executor were held liable on the ground of constructive fraud — in taking an assignment when, if they had examined the will, they would have seen that the executor was guilty of a breach of trust. In deciding the case, Sir William Grant said, “Ido not impute to them direct fraud: but they acted rashly, incautiously, and without the common attention used in the ordinary course of business. It was gross negligence not to look at the will, under which alone a title could be given to them. It was not necessary to use any exertion to obtain information, but merely not to shut their eyes against the information which, without extraordinary neglect the}7 could not avoid receiving.” This decision rests on a familiar principle --see Sug. Vend. 1056, pl. 63. Graff v. Castleman, 5 Rand. 195, in which the authorities on the subject were reviewed very much at length by Judge Carr, was decided on the same principlewhich ^governed the case of Hill v. Simpson. An executor and trustee assigned a portion of the trust subject as a security for his own debt. The assignment referred to a deed of trust, which referred to the original deed, which referred to the will, where the whole trust was declared. The assignee was held, therefore, to have notice of the trust and of the breach of it, and to be. a party to such breach.
In Jackson v. Updegraffe, 1 Rob. R. 107, the evidence clearly brought the case within the well settled principle there laid down, .that parties dealing -with an executor or trustee and co-operating with him in the misapplication of assets or trust funds, in violation of the duties of the executor, or in breach of the trust, cannot use such transactions as a defence agai nst the claim of creditors, legatees or cestuis que trust. Id. 120. In Pinckard v. Woods, 8 Gratt. 140, bonds due to a decedent’s estate, and payable to his administrator as such, were sold by him ata discount of eighteen or twenty per cent, to a person who knew that the condition of the estate did not require the sale. The purchaser was held accountable; and properly so.
Now, let us apply the doctrine thus settled to the facts of this case. The sale was made, as we have seen, in February 1846, less than three years after the termination *742 ■of the partnership by the' death of Abby Colton. It was made by one who had full power to make it for the payment of the debts of the partnership. It was made, apparently, at least, for the pa3unent of a debt of the partnership, secured by a deed of trust on the propertj’’, and the purchase money, or most of it, was accordingly applied to the payment of that debt. If that was not really a debt of the partnership, there is certainly no evidence in the record tending to prove that the purchaser knew the fact or had any rea'son to be-Heve it; but the contrary. He *gave full value for the property, paid the purchase money in cash, and derived no benefit from its application. It was not the duty or business of the purchaser to enquire into the necessity or expediency of the sale, or to see to the application of the purchase money. He had a right to presume, in the absence of all direct or plain proof to the contrary, that the executor was exercising his power fairly and faithfully, in conform-itj’- with his duty. He had no right, it is 'true, to shut his eyes against information which, without extraordinary neglect, he could not avoid receiving. But where is the evidence that he did so? Where is the direct or plain proof, even that the executor committed a breach of trust in the sale of the property or the application of the proceeds, much less that the purchaser participated therein? Is it to be found in the facts that the executor engaged in various speculations on his4 own account, and involved the funds of the partnership therein ; that in 1842 or 1843 he became so much embarrassed that it was generally known about Richmond; and that he ultimately (though at what time does not appear) took the oath of insolvency? Non constat that the appellant was informed of any of these facts when he made the purchase. But suppose he was informed of them; do they afford that direct or plain proof of fraud which is required in such cases? The fraud of the executor, if any, did not consist in his embarrassment and insolvency, but in the conversion of the property or its proceeds from the purposes of the trust to the individual uses of the executor. A knowledge by the appellant at the time of his purchase that such a fraudulent conversion was in-, tended, would have implicated him in the fraud: but not a knowledge that the executor was engaged in hazardous speculations on his own account, or was embarrassed or insolvent. An embarrassed or even an *in solvent man may be appointed an executor, and a grant to him of probate of the will cannot be refused on account of his poverty or insolvency. 1 Williams Ex’ors 119.
Insolvency of an executor happening after his appointment, is not, ipso facto, a vacation of his office nor a suspension of his powers: though it may be one among other reasons for a revocation or suspension of them by a court of competent jurisdiction. Until thus revoked or suspended, they may lawfully and properly be exercised and pass a good title to a bona fide purchaser.
But it is said that the appellant required and received an indemnifying bond; and that this fact shows that he knew he was acquiring a defective title, and, in connection with the other circumstances, is sufficient evidence of fraud on his part. I do not think so. I think it only serves to show his abundant caution. He was about to pay a large sum of money for the tenement in question, and to erect very costly improvements upon it; and prudence required that he should obtain all the security he could against any possible defect of title. He accordingly obtained a deed for the property, executed not only bj'Henry Clarke in his own right and as surviving executor of J. B. Colton, but also by him as surviving partner of Colton & Clarke, and by him and William J. Clarke as executors of Abby Colton. And to guard against the claim of Eitzhugh and of Shuble and wife, he obtained the indemnifying bond in question. He certainly did not intend to admit their claim by taking the bond, and this act of abundant caution on his part should not operate to his prejudice. It shows that he had heard of such claim, which fact indeed he expressly admits in his answer. But he had doubtless only heard of it as it appeared in the suit of Eitzhugh *v. Clarke; and the nature of the claim asserted in that suit I have already^ sufficiently considered. In this feature of the case it is very much like that of Johnson v. Kennett, 3 Myl. & Keen 624, 10 Cond. Eng. Ch. R. 332. A testator had charged his real estate with the payment of his debts and legacies. His only sou and heir at law, who was his executor, paid the debts out of the personal estate, and sold the real in lots to different purchasers, to whom he gave bonds of indemnity, some of which were conditioned for indemnifying the obli-gees against the legacies specially, and others were general bonds of indemnity. The suit was brought by the legatees against the executor and purchasers, &c. It was held by Eord Eyndhurst, that where an estate is charged generally with the payment of debts and legacies, and the debts have been paid but not the legacies, the purchaser will not be bound to see to the application of the purchase money, unless it be proved that he knew of the payment of the debts; and that the taking of the said bonds of indemnity did not raise the inference that the purchasers or any of them knew of such pa37ment in that case.
I am therefore of opinion that the appellant acquired a good title to the tenement in controversy by the deed under which he claims. The property belonged to Colton & Clarke. The execution of the deed by Clarke and wife had the effect of conveying his interest; and its execution by him as surviving executor of Colton, had the effect of conveying the interest of the latter. If any thing else were necessary to confirm the title of the purchaser, it would be found in the execution of the deed by Clarke as surviving partner of Colton & Clarke, and *743 by the executorvS of Abby Colton. The result of my opinion is that the decree be reversed with costs, and the bill dismissed as to the appellant with costs; but without ^'prejudice to any relief to which the appellee Christian may be entitled against any party other than the appellant.
AI/E-DN, P., and DDE), J., concurred in the opinion of Moncure, J.
DANIDD, J., divssented.
Decree reversed.