## Richmond.

## BROCKENBROUGH v. TURNER AND ALS.

## HARDING'S EX'OR v. SAME.

February 28, 1884.

1. EXECUTORS AND ADMINISTRATORS—*Title to assets.*—Legal title to testator's assets in executor's hands for administration, whencesoever arisen, is in executor.

2. IDEM—*Purchasers.*—Bona *fide* purchaser for value of assets acquires good title thereto, though executor commit *devastavit* by the sale and conversion to his own use.

3. IDEM—*Idem—Enquiry—Fraud.*—Such purchaser has no adequate means of enquiry, and need not enquire whether the estate needs the sale, and is not bound to see to the application of the purchase money; he may presume the sale rightly made, and the price properly applied, and he is only bound if he fraudulently collude in the *devastavit.*

4. IDEM—*Idem—Onus probandi.*—Where executor sells bonds at heavy discount, or with them pays his own debts, the burden rests on purchaser to show either that the estate needed the sale or that the bonds had become executor's individual property by reason of his advances to the estate or legatees, or had accounted for them.

5. IDEM—*Idem—Rule.*—The rule is that if executor sells the assets at such gross undervalue as makes it apparent he intends a *devastavit,* the purchaser buys at his peril, and should make the necessary enquiries.

6. CASE AT BAR.—Here B for full value buys bona *fide* certain bonds of solvent executor, who had become owner of three-fifths of the estate. Here, also, H, under same circumstances, bought for full value other bonds of executor, but took said bonds to pay debt due himself from the executor individually, the aggregate of the bonds being less than executor's share of the estate.

HELD;

      Under the circumstances of this case neither B nor H colluded in the *devastavit,* and is liable therefor.

Appeal from decree of circuit court of Westmoreland county, rendered 18th April, 1881, in the two cases of *Brockenbrough* v. *Turner and als.*, and of *Harding's Ex'or* v. *Same*, heard together.

Opinion fully states the facts.

*George Walker*, for Brockenbrough, appellant.

*W. W. Walker*, for Harding's ex'or, appellant.

*Friend* and *Davis*, for the appellees.

LACY, J., delivered the opinion of the court.

Frances A. Cox died in the year 1859, leaving a will, in which she bequeathed to Elizabeth Pearson an annuity of three hundred dollars for her life, and directed her executors, James Smith and Thomas Brown, to invest a sum sufficient to insure, from the interest thereof, the regular payment of the annuity. After the death of Mrs. Pearson, the sum so invested was directed to be equally divided between Sarah Ann Richards, Jane E. Rogers, Thomas N. Murphy, Mary McGuire and John N. Murphy. The said executors qualified, with R. L. T. Beale, B. F. Brown and Willoughby Newton as their securities. The said Newton is dead and insolvent; the said Smith alone acted—Thomas Brown taking no part in the administration of the estate.

The said Smith reserved a bond of one Dandridge Cox of $5,150 as the funds from which to raise and pay the annuity to the said Elizabeth Pearson, secured by trust deed on the Mt. Zion estate.

An annuity was also charged upon the estate of Frances A. Cox, as the heir at-law of Robert Bailey, dec'd. The said Smith reserved also a bond of R. H. Lyell for $550 to secure the payment of this annuity. The annuitant, Eliz-

abeth Pearson, died in 1878. The annuity to the said Elizabeth Pearson was paid during her life.

During the life of the annuitant, the said Smith had purchased of Sarah Ann Richards, Thomas N. Murphy, and John N. Murphy their shares in the funds reserved above.

The above named Dandridge Cox, having become insolvent, the said Smith caused a sale of the Mt. Zion estate to be made, in the year 1868, and it was purchased by Joseph W. and Garrett P. Dungan, at the price of $5,310. These purchasers executed to James Smith and Thomas Brown, executors of Frances A. Cox, their five bonds for $853.59, making together $4,267.95, and paid in cash to James Smith the residue, after paying the expenses of executing the trust to the trustee. These bonds were payable, respectively, on the first day of January, 1870, the first day of January, 1871, the first day of January, 1872, the first day of January, 1873, and the first day of January, 1874.

After purchasing the three interests above mentioned, Smith assigned two of these bonds—to-wit: the one payable on the first day of January, 1871, and the one payable on the first day of January, 1872, both being then due, to William F. Brockenbrough, and received in satisfaction a bond belonging to said Brockenbrough, less in value than the two, and the difference in money. The transaction was dollar for dollar, the bonds being assigned and received at their full value, there being no profit whatever in the transaction to the said Brockenbrough, the exchange being made for the accommodation of the said Smith, who, having become the owner of these bonds, wished to exchange them with Brockenbrough for the bond held by him, with William Harding as one of the obligors, in order to exchange the same for his own bond held by said Harding. The said Brockenbrough knew at the time of the transfer of these two bonds to him, that the said Smith was the owner of the three shares, and that Smith still held bonds suffi-

cient to meet the interest of the two parties, which he had not purchased.

A part of the Mt. Zion tract of land was sold by the Dungans to William Dawson, with the assent of Smith, and the bonds taken payable to James Smith. These bonds were six in number, for $192.00 each, making $1,152.00.

About one year after this Smith assigned these Dawson bonds to William Harding, and the Dungans bonds, falling due January 1st, 1874, to pay a debt due said Harding by Smith. Besides these assignments Smith collected the bonds falling due January 1st, 1870, amounting to $904.80; the bond which fell due January 1st, 1873, making for that $1,058.47, and the cash payment at the re-sale of $1,042.05, less the expenses of executing the trust, making about $3,000. So that he assigned of this fund $2,560.77 for value, at no discount, and collected the residue, including the Lyell bond, which he is accountable for.

At the time of these assignments Smith was a man of good property and good standing, and was the owner of the fund, by purchase, to a greater amount than he so assigned. He accounted to the annuitant during her life, and at her death, Smith failing to pay over to Jane E. Rogers and the children of Mary McGuire, Eliza, and Jane, who had intermarried with George Turner, they brought suit against him and his sureties on his official bond, and the said William F. Brockenbrough, and the personal representative of William Harding, who is Lucien T. Harding, and W. W. Walker, who is alleged to have collected, as the agent of William Harding, or in some other way, some of these bonds, or to still hold them.

It is admitted that James Smith has defaulted as executor of Frances A. Cox, and his liability on account of the estate is not denied; but the question involved in this case is as to the parties to make good his defalcation; whether R. L. T. Beale and B. F. Brown, his sureties on his official

bond or the said Brockenbrough and Harding, named above; and if the latter, whether jointly and equally, or inversely in the order of their purchase respectively.

The circuit court of Westmoreland, on the 8th of April, 1881, entered a decree against James Smith and his sureties in favor of Rogers and wife for the sum of $862.80, with interest from September 1, 1878; and in favor of George Turner and Jane, his wife, for $570, with interest from May 1, 1878, and in favor of Mary McGuire for the like sum of $570, with interest from May 1, 1878; but provided that the said decree should not be enforced against the sureties of Smith on his official bond until the bonds and sums assigned to and collected by William F. Brockenbrough and William Harding and his legal representatives, as aforesaid, shall have proved insufficient for the payment of the sums so decreed to the said complainants; and decreed against the personal representative of William Harding for the sum collected by William in his lifetime, and against W. W. Walker the amount which had passed to him, amounting together to the sum of $1,001.41; and the sum remaining then due to the complainants being $1,345.01, that sum was decreed against Brockenbrough, and receivers were appointed to collect the same. The effect of which decree was to exonerate the sureties on the official bond of this executor from all liability, and place it upon Brockenbrough and Harding, and W. W. Walker.

It will be remembered that Brockenbrough paid full value for the bonds received by him, and that the bond assigned by him was Harding's bond, which was passed to Harding by Smith to pay Smith's debt, and that Brockenbrough was in no wise benefited, either directly or indirectly, by his share in the transaction; and that Harding also paid a full equivalent to Smith for what he received. The above facts are admitted, and not controverted at all, and are set forth in the opinion of the judge who de-

cided the case in the circuit court. It must be borne in mind that the first investment made by the executor to meet the annuity, was necessarily changed by the failure of Dandridge Cox, and his consequent failure to pay the annual interest out of which the annuity had to be paid; that the land was sold, and other bonds taken, five in number, which fell due as above indicated.

The circuit court held that there could be no doubt but that Smith had committed a breach of trust, for which the sureties are liable.

The question, the judge says, is as to the ultimate liability, whether that rests on the securities, or on Harding's estate and Brockenbrough, and in what proportions as to them. If the plaintiffs had proceeded directly on the official bonds against the executors and sureties, payment of the amount due to them could have been made out of the sureties, and they would have been left to their recourse over, if any, against Harding and Brockenbrough.

But as all the parties were before the court, the court proceeding as if the claim were directly against Harding and Brockenbrough, held that Harding could not be held to account for the Dawson bonds, because they were payable on their face to James Smith individually, although they belonged to the trust fund, but held him liable for the Dungan bonds, as we have seen. It also held Brockenbrough responsible, upon the ground that he purchased the bonds during the lifetime of the annuitant. It should be here added that the learned judge of the circuit court concluded his opinion, which is made a part of the record, with the following language: "It is almost unnecessary to add, that in this case there is nothing in the *slightest* degree reflecting upon Mr. Harding or Mr. Brockenbrough; there is not the *slightest* ground for supposing that either was influenced in the *slightest* degree by *any consideration of personal benefit,* or that any such was desired by them

from the transactions in which they were involved. It is manifest that their *sole motive* was to accommodate and assist a commissioner in whom they had implicit confidence, and that this was done without the slightest idea of a possible injury to anybody. It is their misfortune that they should have dealt with a fiduciary and under a mistaken opinion as to *his* rights and *their* liabilities."

This emphatic testimonial as to the motives of these appellants in the premises has an important bearing upon this case, as we shall presently see.

From this decree the appellants, Brockenbrough, Harding's administrator, and W. W. Walker, applied for and obtained an appeal to this court.

The question involved in this case is as to the liability of the appellants, as purchasers of a portion of the estate of the testatrix from her executor, James Smith. The general principles upon which this question must turn are well settled. There can be no doubt but that an executor is invested with the legal title to the assets of his testator which come to his hands for administration, whether they arise from personal estate or from real estate, directed by the will to be sold for the payment of debts and legacies, and sold accordingly by the executor. Nor can there be any doubt but that a *bona fide* purchaser, for value and without notice, of a portion of such assets, either directly or indirectly, from the executor, will acquire a good title thereto, even though the executor commit a *devastavit* by making the sale for the purpose of converting the proceeds to his own use, and by actually so converting them.

All the cases agree in the principle that a purchaser from an executor of personal property of a testator for *valuable consideration* need not enquire, and has no means adequate to make the inquiry, whether the condition of the estate of the testator require a sale of the property, and is not bound to see to the application of the purchase money,

but may fairly presume that the sale is rightly made and that the purchase money will be properly applied, and that such a purchaser can only be made responsible on the ground of *fraudulent participation* with the executor in the commission of a *devastavit* by the executor of his testator's estate. In other words, that the purchaser must be guilty of a fraud in that respect. *Jones* v. *Clark*, 25 Gratt. 642.

At one time in the history of this question in the courts, it was always held to require actual fraud on the part of the purchaser. In the case of *Nugent* v. *Gifford*, 1 Atk. R. 463, an executor had assigned a mortgage term of his testator to pay the executor's own debt. Lord Hardwicke held it a good alienation against the creditors and the heirs, saying : " The court would follow the assets in case of fraud, but not when the executor disposed of them for a valuable consideration, and without fraud; and that it would be very mischievous if the court were to control this power of alienation, as no person would venture to deal with executors." "There was no difference in the power of the executor to dispose of legal and of equitable assets." See *Mead* v. *Lord Orrery*, 3 Atk. R. 235; *Whale* v. *Booth*, 4 Term R. 625, note.

This rule, as is well known, however, has been modified. It has been more recently held that, if upon the face of the assignment of the property it appeared to have been made in satisfaction of a private debt of the executor, the sale was fraudulent against persons interested under the will, and equity would relieve, though it is admitted that the purchaser from the executor in general is not bound to see to the application of the money. *Bonney* v. *Ridgard*, 1 Cox R. 145. Where an executor pledged bonds *specifically devised* as a security for his own debt, the pawnee was required to deliver them up for the benefit of the specific legatees.

Here again it was admitted that in general the purchasers of the assets had no concern with the application of the price, and that the rule applied to mortgages, bonds and leases. *Scott* v. *Tyler*, Dickens, 712.

But if one concerted with the executor to obtain the goods at a nominal price, or a fraudulent under-value, or in extinguishing the private debt of the executor, or in any other manner contrary to the duty of the office of executor, the purchaser or pawnee will be held liable. When bonds were delivered to a banker as a security for the private debt of the executor, they were ordered to be delivered up by the pawnees. *Scott* v. *Tyler*, *supra*.

Chancellor Kent, in the case of *Field* v. *Schieffelin*, 7 Johns. Ch. R. 150, after reviewing the above cases and others, said: " I have thus looked pretty closely into the decisions in the analogous case of a purchase from an executor" (that was the case of a purchase from a guardian) " of the testator's assets, and they all agree in this, that the purchaser is safe if he is no party to any fraud in the executor, and has no knowledge or proof that the executor intended to misapply the proceeds, or was in fact by the very transaction applying them to the extinguishment of his own private debt. The great difficulty has been to determine how far the purchaser dealt at his peril when he knew, from the very face of the proceedings, that the executor was applying the assets to his own private debt. The later and the better doctrine is, that in such case he does buy at his peril; but that if he has no such proof or knowledge, he is not bound to enquire into the state of the trust, because he has no means to support the enquiry, and he may safely repose on the general presumption that the executor is in the due exercise of his trust."

In *Graff* v. *Castleman*, &c., 5 Rand. 195, Judge Carr said, delivering the opinion of this court: " In the case of *Keane* v. *Roberts*, 4 Mad. Ch. R. 332, the vice-chancellor said:

'Every person who acquires personal assets by a breach of trust or devastavit in the executor is responsible to those who are entitled under the will, if he is a party to the breach of trust. Generally speaking, he does not become a party to the breach of trust by buying or receiving as a pledge for money advanced to the executor at the time, any part of the personal estate, whether specially given by the will or not, because this sale or pledge is held to be *prima facie* consistent with the duty of the executor. I preface both these propositions with the words *generally speaking*, because they both seem to admit of exceptions.'"

In *Fisher* v. *Bassett*, 9 Leigh, 119, an administrator took a bond to himself individually for a debt due to his intestate's estate, payable at a distant day, and then sells the bond at a discount of *twenty-five* per cent. to an assignee, who knew that the consideration of the bond was a debt due to intestate's estate, but is informed, and so informed as to justify him in believing that the administrator has acquired the full property in the bond in his own right. The burden of proof was then held to be on the assignee to show the fairness of the administrator's conduct, "and if the administrator had not purchased the claim from the next of kin, or had not made such advances as to justify him in appropriating it to himself, the assignee cannot in equity avail himself of the transfer." "The sale of the bond at so large a discount was held in itself to be *prima facie* a *devastavit*, and the burden of proof is upon the assignee to show that the necessities of the estate, and not those of the administrator, required the sacrifice." He spoke of the sale as having been made "at the ruinous rate of twenty-five per cent. discount, without evidence that the necessities of the estate required it." When the assignee bought the bonds "at so much less than their value, under the circumstances in that case he was held to have taken on himself the burden of showing either that Scott was the

real owner, or that the necessities of the estate justified the sacrifice." *Fisher* v. *Bassett,* 9 Leigh, 119.

In the case of *Pinckard* v. *Woods,* 8 Gratt. 140, the executor sold the bonds taken at the sale of the personal property at a discount of about twenty per cent., the purchaser knowing that the liabilities of the estate were very inconsiderable, and that the sale of the bonds were not necessary for *any* purposes of administration. In this case the purchaser was held liable because he purchased at a profit, a ruinous discount to the estate, and because he had knowledge that the estate did not require that or any other sacrifice.

In *Cocke* v. *Minor,* 25 Gratt. 246, Judge Bouldin said: "That the conversion into money by a trustee of well secured bonds belonging to a trust fund, by a sale thereof, at a large sacrifice to the purchaser, with full notice of the trust, does constitute such an improper dealing with and *devastavit* of the trust subject as will render both trustee and purchaser *prima facie* responsible therefor, is a proposition about which, at this day, there can be no doubt."

In the case of *Jones* v. *Clark,* 25 Gratt. 663, Judge Moncure, speaking of the assignee of the executor, said: "The bond was payable to the executor in that character which gave express notice to the purchaser that it belonged, in its origin at least, to the testator's estate, and he bought it from the executor at a discount of eighteen per cent. Nothing but the necessities of the estate could have justified the executor in making such a sale, unless the bond had become the individual property of the executor, by his advancements made on account of the estate or otherwise. . . . The burden of proof is on the purchaser to show that the duty of the executor required the sale on the terms on which it was made, or that the bonds belonged to him individually, or at least that he has fully and properly accounted for the amount of the bonds to the persons entitled thereto."

In that case the purchaser, who purchased at a heavy discount from the executor, was held liable, while a subsequent purchaser, who bought at the actual value, was held not to be liable. The court in this case said, speaking of the assigned bonds, "that they were payable to the executor, as such, did not show that he did not part with them lawfully. The legal title was vested in him, and he had the right and it may have been his duty, to sell them, as it certainly would have been to collect them at maturity, if not sold before. The duty of a purchaser from an executor of a bond payable to him as such, to make enquiry as to the propriety of the sale, does not arise from the fact that the bond is so payable. The only effect of that fact is to inform him that the bond is a part of the assets of the testator. And an executor may lawfully sell the assets, whether they consist of a bond or anything else; and a fair purchaser cannot be held responsible, though he make no enquiry as to the propriety of the sale. That is a question to be decided by the executor, to whose discretion the testator and the owner of the property has referred it, and persons may lawfully trust him and purchase assets from him without any enquiry, if the conduct of such persons in the transaction be fair. Confidence being placed in the trustee by the person who had the sole right to dispose of the property at his will, no other can question the correctness of the proceeding, or can be justifiable in suspecting an intention to violate the trust. He has no right to suspect that the person who has been selected by the testator for its execution will violate the trust reposed in him, and no collusion between him and the trustee ought to be implied from equivocal acts—(citing *Garnett* v. *Macon,* 2 Brock 185, 231; *Davis* v. *Christian,* 15 Gratt. 11, 46). . . . If a bond is offered for sale by an executor, which is payable to him as such, at a heavy discount, as, for instance, eighteen or twenty per cent., that fact affords to the person to whom the offer is

made, good reason to believe that the sale is intended to
be made for the use of the executor, and not for the benefit
of the testator's estate.

"It has been decided in no case," says Judge Moncure,
"that a sale of a bond at a discount, however small, will
afford sufficient reason to believe that a *devastavit* is in-
tended by an executor. A sale of a bond at par, or abating
only the legal discount for the time the bond has to run to
maturity, would certainly afford no reason for believing
that a *devastavit* is intended; nor, we imagine, would a
very small additional discount. It is often to the interest
of an estate, and agreeable to the legatees, for such a sale
to be made, especially in a case in which a bond has a long
time to run. Suppose a bond which would have to be col-
lected probably by a suit, is sold at a discount not more
than equal to the ordinary expenses of collecting such a
bond, would such a sale be a *devastavit* in the executor?
The rule in regard to the sale of any property by an execu-
tor, including, we suppose, as well bonds as other property,
is that if it be sold at such a gross undervalue as to afford
good reason to believe that the executor intends to commit
a *devastavit* the purchaser will buy at his peril, and ought,
for his own safety, to make the necessary enquiries. But
who can say that the sale of a bond at a very small dis-
count—the smallest at which it could possibly be sold—
would be a sale at a gross undervalue. In the three cases
referred to " (*Fisher* v. *Bassett*, *Pinckard* v. *Woods*, and
*Cocke* v. *Minor*), says the learned judge, "which are the
only cases we have seen on the subject of a sale of bonds
by an executor, the sale was spoken of as at a 'sacrifice,'
and sometimes at a 'ruinous sacrifice.' In *Fisher* v. *Bas-
sett* the sale was at a discount of twenty-five per cent.
In *Pinckard* v. *Woods*, it was at a discount of eighteen to
twenty per cent. In *Cocke* v. *Minor*, at a discount of twenty
per cent. In this case " (speaking in *Jones* v. *Clark*) "the

sale to Neal was at a discount of at least eighteen per cent.
But the sale by Neal to Jones was at a very small discount
—not as much probably as one-half that sum—and Neal
proves that it was low.   If, therefore, the bonds had been
bought by Jones of the executor, instead of Neal, we could
not say that the bonds were sold at a gross undervalue, or at
a sacrifice.   Both of the bonds had some time to run when
sold, and one of them, the larger, more than a year,  . .
and after paying expenses of collection, Jones, perhaps,
received but little more than six per cent. on his money.
To make him now pay the whole amount of the bonds,
with interest until payment, would be to impose a very
heavy penalty on him, certainly one exceeding his offence,
whatever that may be, and far exceeding any loss which
anybody can have sustained from his act; for nobody, in
fact, can have sustained any such loss at all.  . . . .
Having the legal title to and the possession of the subject,
and at least as much equity as anybody else can have,
there can properly be no recovery against him on account
of the bonds."

In the same case, a bond had been assigned to Barksdale,
and the money collected, and the executor defaulted as to
that also, there was evidence tending to show that this as-
signment was merely formal.   This court said as to that
bond : " This may have been an unreasonable and awkward
mode of settling the matter, but certainly the evidence is
not sufficient to convict Barksdale of a fraud, which is ne-
cessary to make him responsible as a party to the *devasta-*
*vit* of the executor.   A fraud should not be presumed but
must be plainly proved."   Barksdale was held not to be
liable, even if the transaction be considered as a sale of
the bond by the executor to Barksdale at a discount of five
per cent.   See *Jones* v. *Clark*, 25 Gratt. p. 674.

This case is thus fully set forth because it must be re-
garded as a leading authority on the question before the

court in this case, and because it was expressly relied on by the learned judge who decided this case in the circuit court, and by the counsel who argued the case here for the appellees. If we remember the circumstances of this case, and regard them in the light of the foregoing authorities, the case does not appear difficult of solution. As to Brockenbrough it will be remembered that he bought the bonds in question not only not at a ruinous discount, but at no discount at all, he paid for them full value ; and he did not receive them either in satisfaction of his own debt. Upon what principle can he be held responsible to these sureties of this executor ? What was the undertaking of these sureties in the executorial bond ? Are their liabilities to be postponed, to follow the testator's property into the hands of every purchaser from the executor, however *bona fide* he has acted, and although he has paid the full value for what he has received ? It cannot be so held. There is no ground whatever to charge the *devastavit* of this executor upon the appellant, Brockenbrough, more than upon any and every purchaser who may deal upon fair terms with an executor in the legitimate discharge of his duties as such. For it must be remembered that Brockenbrough did not make a dollar of profit for himself out of the transaction.

As to William Harding, it appears that he purchased of the executor at a full value, there being no discount; but the bonds appear to have been assigned to Harding to take in an individual debt of the executor due Harding. Then, according to the decided cases, the burden of proof may be claimed to be upon Harding to show that the executor, Smith, had the right to use the bonds in question to pay his own debt, by being in advance to the estate, or by advancement to the legatees. The evidence in the cause shows that the executor had become the owner of three-fifths of the estate by advancements to the legatees, hav-

ing thus acquired the sum of $3,420 out of the $5,700.   The
assigned bonds, both to Harding and Brockenbrough, ag-
gregated $2,560.77, several hundred dollars less than the
interest that belonged to him.   This is admitted, and, in-
deed, it is proved, and, upon a suit brought and reference
to a commissioner, the report showed that Smith had ex-
hibited the assignments to the commissioner, which the
commissioner stated he had seen, and that they showed
that Smith, " the acting executor, has purchased the inter-
est of nearly all the parties entitled in remainder after the
death of Mrs. Pearson, as appears from papers produced
and shown to your commissioner by James Smith."   This
in 1876.   Smith did actually own what he assigned both to
Brockenbrough and Harding, and proved the fact to them
when he dealt with them.   Afterwards he defaulted, by
reason of a crisis in his affairs, caused by loss of property in
Baltimore, and the sureties seek to avoid their undertaking
upon the bond of Smith as executor by alleging that Smith
had no right to buy until the death of the life annuitant ;
that her interests were thus put in jeopardy.   But while it
does not very clearly appear that her interest, as annuitant
for life, would not be as well preserved in the one case as
the other, the fact in this case is that the annuity to Mrs.
Pearson was regularly paid up the time of her death.   It
does not appear that either Brockenbrough or Harding can
be held to have fraudulently contributed to the default of
the executor;   both dealt with him fairly and for full value,
and received what was in fact his own property, so far as
the appellees are concerned, whether the legatees or the
sureties upon Smith's executorial bond, and Smith was in
no way injured.

This responsibility was in no way affected by either
transaction, as both were at a fair price and for full value.
Neither can be said to have contributed to any devastavit
or default on the part of the executor.   That neither in any

wise fraudulently contributed to nor fraudulently concerted
with the executor toward his subsequent defalcation. If
Brockenbrough had not purchased the bonds he obtained,
Smith had the authority and could have collected them as
they were then due, and doubtless would have done so long
before the death of the annuitant; and the same may be
said of Harding. And it may be remarked that the dis-
tinction drawn between the Dawson bonds and the Dungan
bonds is not sustained by the authorities cited, one being
taken by the executor in his own name individually, and
the others in his name as executor; for we have seen that
" the duty of a purchaser from [an executor, of a bond pay-
·able to him as such, to make enquiry as to the propriety of
the sale, does not arise from the fact that the bond is so
payable." *Jones* v. *Clark, supra.*

The charge upon the assignee is founded upon fraud ac-
tual or implied; without such fraud all the cases agree that
there is no liability on a purchaser; if his acts are *bona
fide,* he is safe.

Now let us remember the emphatic endorsement by the
learned judge who decided this case, of the motives of the
appellants. He says that there is not the slightest ground
for supposing that either Brockenbrough or Harding were
influenced by the slightest motive for personal profit or
benefit. Without this fraudulent concerting with the ex-
ecutor in his breach of trust can these assignees be held
liable?

In *Truss* v. *Old,* 6 Rand. 556, Judge Green, speaking of
the analogous case of a guardian disposing of his ward's
estate, said : " Their authority is coupled with a legal in-
terest and is not clearly an office. It is like the interest of
an executor in trust," expressing the opinion that the
guardian had the power to sell the personal assets of his
ward's estate.

In *Bank of Virginia* v. *Craig,* 6 Leigh, 399, the judges

say the power is proved by many cases, and though " the guardian is personally responsible for so doing, the vendee to whom he sells is not responsible, if he has dealt fairly and justly and without notice of any fraudulent intent."

In the case of *Hunter* v. *Lawrence*, 11 Gratt. 111, the guardian was held liable, but the vendee held not to be liable, he having taken it at par in part payment of a debt amply secured (this is precisely the case of Brockenbrough here in this case). "He was not induced by hope of profit or fear of loss to take the transfer. His only purpose was to receive a debt justly due by a mode of payment convenient to both parties, and he was acquitted of any constructive fraud as well as of actual fraud." The court said " the ward and the purchaser are the victims of the guardian's fraud; and in settling the question of loss between them, the court should proceed upon the general principles of equity. If the equities are equal, the court will not interfere ; or if one party have the advantage at law, equity will not interfere to deprive him of that advantage, unless in favor of a party having superior equity ; . . . a purchaser for value, without notice of fraud in his vendor, stands upon as high ground in equity as any creditor or *cestui que trust;* . . the transfer to Hunter gave him the power at law to receive the money, if paid by Winston, and to give him a valid discharge, or to sue for it and recover it in a common law court in the name of the executor, for his own use, without the possibility of interference by the nominal plaintiff or any other person. Although Hunter may not have had the legal title to the debt, yet such were his rights and powers at law; in the exercise of this right, he has received the money and thereby acquitted Winston of all further liability therefor. To hold him responsible to the ward we must deprive him of the advantage given by his legal power and right. To arrive at such a result, we must overturn all the decisions of the courts upon cases of

the same or like kind." *Hunter* v. *Lawrence*, 11 Gratt. 111.

In *Broadus* v. *Rosson*, 3 Leigh, 12, the parties dealing with the guardian were fully aware of his breach of trust, and actively co-operated with him therein for their own benefit, and for that reason were held liable.

In *Dodson* v. *Simpson*, 2 Rand. 294, the party dealing with an executor was apprised of his breach of trust, and aided him therein, and was therefore held accountable.

In each of these cases, and in many if not all others of like kind, the party dealing with the fiduciary has been held responsible, because and only because of his co-opera- tion in the fraud. In our case this ruling fact does not ex- ist. The ward was held not to have the right to draw the purchaser in question for his dealing with the fiduciary. If the ward has no such right, the sureties on the official bond can have no such right. " If, however," says the court in that case, " the case was otherwise as to the ward and the purchaser, the sureties in that case would not be permitted to subject the purchaser to any liability. The securities bound themselves by bonds for the fidu- ciary, and in 1825, when this bond was in full force, their principal committed the breach of the commission which is complained of in this suit."

" At that time the securities might have guarded them- selves against all loss by using a small degree of dili- gence. They owed it to themselves and to the ward to see that the guardian, who obtained the possession of the ward's estate by means of their credit, faithfully per- formed his trust. . . . The loss resulting from the misplaced confidence of the securities should be borne by them. They trusted first, and they trusted last. They are asking relief against a party who is at least as innocent as themselves, and whose conscience is in no wise touched by their claim; he should not be held liable." See *Lingle* v. *Cook*, 32 Gratt. 262, and *Mills* v. *Mills*, 28 Gratt. 442.

In this case, if the surety, when he obtained the infor-mation in 1876, during the life of the annuitant, which he did by the exhibition of the assignments to this executor, had so desired, he could have stopped all further dealings of the executor with the estate, upon the faith of his credit, by a simple and easy method, and saved not only himself, but the *cestui que trust* from all loss consequent upon any future wasting of the estate; and when he actually had cause to suspect the executor of endeavoring to collect and dispose of the funds of the estate to his own use, he seems to have contented himself with a controversial interview with the executor, and a declaration that whoever bought the assets of the estate from the executor would be held liable. If he did not feel willing to stand first liable under the conditions of the executorial bond, which was very large, he should have sought relief and protection in the mode prescribed by law for his relief as surety, instead of waiting until the fiduciary had actually failed in business, and then seeking to charge the persons who had dealt with the executor long before in perfect good faith, and at a fair and full consideration.

The true rule as to such sales is, as stated by Judge Moncure, that if the property be sold at a gross undervalue, such as to afford good reason to believe that the executor intends to commit a devastavit, the purchaser will buy at his own peril, but if the sale is *bona fide*, and without sacrifice to the estate, and there be no fraudulent contribution on the part of the purchaser, he will be protected, and the sureties will not be allowed to shift their responsibilities on him.

The decree of the circuit court appealed from is erroneous so far as it holds the appellants, Brockenbrough and Harding, liable for the defaults of the appellee, Smith, and should be reversed and annulled so far as the said appellants are held liable for the devastavit of the executor.

HINTON, J., dissented.

The decree was as follows :

This day came the parties, by their counsel, and the court, having maturely considered the transcript of the record of the decree aforesaid, and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that the decree of the circuit court of Westmoreland, in the cause therein of Turner and wife v. Cox's executors and others, rendered on the 8th day of April, 1881, and appealed from in the causes in this court of Brockenbrough v. Turner and others, and Harding's adm'r and others v. Turner and others, is erroneous in so far as it decreed against the appellants, Brockenbrough and Lucien Harding, adm'r of William Harding, dec'd, and W. W. Walker, the payment of the sums therein mentioned, and appointed a receiver to collect the same ; and, therefore, it is considered that the said decree be reversed and annulled in so far as it is in conflict with the foregoing opinion of this court and the views herein.

But the court is of opinion that there is no error in the said decree in holding the defendants, James Smith, R. L. T. Beale and B. F. Brown, responsible for the sums therein decreed to be paid by them to the complainants, the same, in so far as it so appears not to be erroneous, must be affirmed. And it is further considered by the court, that the appellees do pay to the appellants, W. F. Brockenbrough, Lucien Harding, administrator of William Harding deceased, and W. W. Walker, their costs by them expended in the prosecution of their appeal aforesaid here. And this court proceeding to render such decree as the said circuit court ought to have rendered, doth adjudge and order that the bill of the complainants be dismissed as to the defendants therein, the said W. F. Brockenbrough, Harding's ad-

Decree.

ministrator, and W. W. Walker, and that the said complainants do pay to the said defendants—Brockenbrough, Harding's administrator, and W. W. Walker—their costs by them expended about their defence in the said circuit court. And it is further adjudged and ordered, that the complainant, John M. Rogers, and Jane, his wife, recover of the defendants—James Smith, R. L. T. Beale, and Benjamin F. Brown—the sum of eight hundred and sixty-two dollars and eighty cents, with legal interest thereon from the first day of September, 1878, until paid, and that the complainants, George Turner, and Jane, his wife, recover of the defendants—James Smith, R. T. L. Beale, and Benjamin F. Brown—the sum of five hundred and seventy dollars, with legal interest thereon from the first day of May, 1878, until paid, and that the complainant, Mary McGuire, recover of the defendants—James Smith, R. L. T. Beale, and Benjamin F. Brown—the sum of five hundred and seventy dollars, with legal interest thereon from the first day of May, 1878, until paid, and that the said James Smith, R. L. T. Beale, and Benjamin F. Brown pay to the complainants their costs by them expended in the prosecution of their suit in the said circuit court. Which is ordered to be certified to the said circuit court of Westmoreland.

DECREE REVERSED IN PART.